[Crim. No. 41413. Second Dist., Div. One. Mar. 30, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN RONALD DE LARCO, JR., Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Cheryl Lutz, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., Gary R. Hahn and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HANSON (Thaxton), J.—**

### PROCEDURAL HISTORY

By amended information, defendant was charged with burglary, a violation of Penal Code section 459. Defendant entered a plea of not guilty. Trial was by jury.

During cross-examination of the first prosecution witness, the court expressed concern about the accuracy of a preliminary hearing transcript. Defense counsel's use of this transcript for impeachment purposes was complicated by the fact that the witness was Spanish-speaking and he required an interpreter in order to testify. After holding an *in camera* hearing, the court found the transcript was unreliable and sustained its own objection to its further use to

impeach this witness. The court then instructed the jury to disregard all references to the preliminary transcript. The court subsequently denied defendant's motion for mistrial and motion to strike all of the testimony of the witness.

The jury found that the defendant was guilty of burglary in the second degree. Probation was denied and appellant was sentenced to state prison for the upper term of three years, with thirty days' credit.

Defendant has appealed from the judgment of conviction.

## Factual Background

On May 30, 1981, at about 3 p.m., Jose Ramirez and Victor Borja locked up and left Borja Automotive Shop (Shop) at 319 West First Street in Claremont. Ramirez worked at the shop as a mechanic, as well as a night watchman, for which he received free room, where he lived, upstairs from the shop in a partially open loft space.

Ramirez returned home to the shop at about 2:40 a.m. Sunday morning and he noticed a hoodless car parked in a parking place belonging to the shop, located in an alley behind the shop. The car had not been parked there earlier when he left the shop. Ramirez did not recognize the car; he became suspicious and he blocked the car with his own car. He proceeded to open the shop and as he inserted the key he heard the sound of glass falling. As he hurriedly entered the dark shop he saw a tool box with all its drawers scattered and the money box in the office was open. Then he saw some legs in the shop's interior moving toward the outside. He turned on the light and for about 30 seconds looked at the face of the man whose legs he had seen earlier, as he was climbing out the window to the outside.[1] Ramirez also saw a second person already outside whose face he could not see. At trial, Ramirez positively identified appellant as the person whose face he had seen.[2]

Ramirez first telephoned his employer Borja to call the police because he spoke very little English. Borja arrived with his wife about 20 minutes later.

---

[1] On cross-examination, the witness said he had seen the face for only two to three seconds.

[2] During cross-examination, the witness testified that the front door was about 20 feet from the light switch, which was located at the shop's office. The distance between the front door and the window was about 70 feet. The office was situated some 35 to 38 feet from the window. Ramirez was standing near the window about 35 to 38 feet from the face he identified as the defendant's, when he turned on the light switch. The window, which measured $10\frac{3}{4}$ inches x 12 inches, where the witness saw the man, was about 7 feet high. Furthermore, Ramirez said he had 20/20 vision and that there was a street light located outside about 20 feet from the window.

Mrs. Borja served as interpreter when the police interviewed Ramirez.[3] Ramirez showed the police the disorderly shop, where all the tools were moved from the tool boxes to cardboard boxes, lined up next to the broken window. The tools had been in tool boxes, where they were ordinarily kept, when Ramirez and Borja had closed the shop earlier. A chrome flashlight, colored white, unlike the plastic ones used at the shop, was found near the broken window.[4] Also, $400 was missing from a cash box. Ramirez did not give anyone permission to enter the shop that night.

During cross-examination, Ramirez described the intruder he saw as being 5 feet 5 inches to 5 feet 7 inches, 120 to 135 pounds, with blue eyes and light-brown shoulder-length hair. He described the two intruders as being from 18 to 20 years old. Officer McMahan testified that Ramirez described the intruders as being aged 18 to 20 and both looked alike, one was 5 feet 7 inches and 170 pounds with shoulder-length blonde or light brown hair.[5]

After interviewing Ramirez, the police conducted a surveillance of the car, a 1967 Pontiac GTO, which Ramirez had blocked off earlier. At about 5:30 a.m., defendant drove off in the GTO. Police in several marked cars followed defendant—one car immediately turned on the rotating light bars atop it and later swerved into a driving lane in front of the GTO. The GTO swerved to avoid the police cars, crossed four lanes to make a left turn and then speeded up. The second police car turned on its siren and gave chase. The GTO could not negotiate a turn, slid across the street, jumped a curb, and came to rest in a parking lot some 20 to 25 feet from the sidewalk. Defendant then left the car and began to run but was apprehended after a foot chase.

### DEFENDANT'S CASE

After defendant was arrested, he was given his constitutional rights which he waived. Defendant told the police that he had not been inside the shop and there was no reason for his fingerprints to be on anything inside the shop. Nevertheless, defendant's fingerprint matched a latent print found on the chrome flashlight. Defendant testified at trial that a few days before the burglary, he visited his friend John Weeden, who worked at the shop. He talked to Weeden for several hours, while Weeden worked on a car, during which time he handed Weeden a few tools.

---

[3]Mr. Borja may have also served as an interpreter during the hour-long interview. Ramirez, who was of Cuban descent, stated on cross-examination that he did understand some English but he was embarrassed to speak it.

[4]Defendant's case sought to rebut this with testimony that metal as well as plastic flashlights were used at the shop, which typically had tools scattered about in disarray, without being put away at night.

[5]The officer testified defendant was 5 feet 9 inches, weighing 140 pounds.

His friend told him to bring his car in over the weekend and he would do some needed repairs on it. On the morning of the burglary at about 2 a.m. defendant dropped off his car at the shop and walked over to a nearby friend's house to get a ride home.[6] His friend, Mark Pearson, who used to work at the shop, was not at home, but he waited for him for three hours, dozing off at times, before leaving to go home. He went back to the shop, got into his car and drove off. He accelerated when he saw the police cars following him because he was frightened. He had no license, the car was unregistered and he thought there was a warrant out for his arrest from a ticket he had received for drinking beer in a friend's backyard. He said he had never seen the metal flashlight, nor had he committed the burglary. He also said his eyes were brown. He had 97 cents on him at the time of his arrest.

## ISSUES

Defendant contends that: (1) the trial court committed reversible error by refusing to allow impeachment of Ramirez, the chief prosecution witness, with a preliminary hearing transcript, and (2) the trial court committed reversible error in instructing the jury pursuant to CALJIC No. 2.62 that they could draw adverse inferences from the defendant's failure to explain or deny the existence of his fingerprint on the chrome flashlight.

## I

Defendant argues that the trial court's refusal to allow him the right to impeach the chief prosecution witness constituted a denial of confrontation guaranteed by the Sixth Amendment and article I section 15 of the California Constitution.

Ramirez testified through an interpreter at the preliminary hearing as well as at trial. Defense counsel, Joan Garrott, sought to impeach him by use of prior inconsistent statements made at the preliminary hearing and statements made on direct examination at trial. Counsel asked defendant if he made certain statements from the preliminary hearing that the man he saw was outside the building.[7] The record shows the interpreter expressed difficulty hearing the en-

---

[6]This was rebutted with testimony that defendant told police following his arrest that Jack Weeden dropped his car off at the shop.

[7]The reporter's transcript of the preliminary hearing contained in the clerk's transcript, the testimony of Ramirez in part reads as follows:

"Q. What did you do when you heard this noise?

"A. I—I turned on the light and I saw that gentleman over there standing outside of the place.

"Q. When you say 'that gentleman' are you referring to someone who is in this courtroom

tire question. After the question was repeated, the witness answered in contradiction to the preliminary testimony that he saw the person outside. An unrecorded bench conference was held. The question was read back and Ramirez again denied testifying to that effect:

"Q. Mr. Ramirez, did you ever testify at the preliminary hearing that you turned on the light and saw the man standing outside the place?

"A. No.

"Q. You never testified to that effect?

"A. If I could explain about this?

"THE COURT: Well, sir, the district attorney will be able to ask you other questions which will probably bring out your explanation, but she is entitled to ask the questions she wants to.

"BY MS. GARROTT: Q. Was that answer no, sir?

"A. No.

"Q. And did you ever testify at the preliminary hearing that you looked in the office, saw that the money was gone, and that was when you saw this gentleman outside the window in the hallway of the—

"A. I don't understand it.

"Q. Did you ever testify—

"THE COURT: I've got an idea that may help in this area a whole lot. Approach the bench for a second and see if you like my idea." (A conference was held at the bench which was not reported.)

---

today?
"A. Yes.
"Q. Would you point to that person today and tell me where that person is seated?
"A. There.
"THE COURT: He's pointed to the defendant DeLarco.
"Q. BY MR. YATES: Where was this man when you turned on the lights and saw him?
"A. When I turned on the light with—very carefully, because I didn't know what was going on. When I turned on the—when I turned on the light, I see the boxes of tools of mine empty, and than I—I thought this is strange. I think it's a robbery, then there's a strange car there. I looked in the office and the money container was gone, then—then is when I see this gentleman outside of our windows in the hallway of the Dance or something restaurant."

After the bench conference, the trial judge directed counsel, the witness and interpreter to briefly confer in the jury room. When the trial resumed, both counsel stipulated that the reporter's transcript of the preliminary hearing was an accurate transcription of the proceedings. Mrs. Garrott resumed her cross-examination on whether Ramirez testified that the person he saw at the scene of the crime was standing outside:

"Ms. GARROTT: Counsel, I am referring to page 12, line 8.

"Q. Mr. Ramirez, did you ever testify that the person that you saw was outside the place?

"A. As I said before—

"Ms. GARROTT: And, counsel, I am referring to lines 9 through 14.

"Q. Did you ever testify after the Court asked you whether you saw Mr. De Larco inside the building, that you said, 'No, no, when I turned he was outside. When I turned on the light he was already outside?'

"A. Yes.

"Q. And when the Court asked you, 'Did you see him inside the building at all?' you said, 'No.'

"MR. GAROFALO: What is counsel reading?

"Ms. GARROTT: Lines 13 and 14.

"THE WITNESS: As I explained to you—

"Ms. GARROTT: I would move to strike as not responsive.

"THE COURT: Okay, ask the question again.

"BY Ms. GARROTT: Q. Mr. Ramirez, did you ever testify at the preliminary hearing in response to a question that was asked by the Court, 'Did you see him inside the building at all?' that your response was, 'No'?

"A. I answered no because I didn't see his face.

"Ms. GARROTT: I would move to strike as nonresponsive, your Honor. I think it calls for a yes or no answer.

"THE WITNESS: But I saw his body.

"THE COURT: I believe the answer to the question is, Yes, I answered no. I will strike the balance. That seems to be the essence of his answer.

"Ms. GARROTT: Thank you, your Honor.

"Counsel, I am referring to page 13, lines 2, 5 and 6.

"Q. Mr. Ramirez, at the preliminary hearing did you testify that you saw the person's face outside the building the same place where there was a broken window?

"A. Yes.

"Ms. GARROTT: And, counsel, I am referring to lines 7 through 9 on page 13.

"Q. Did you say that Mr. De Larco was about one foot, more or less, away from the broken window?

"A. Yes.

"Ms. GARROTT: And, counsel, I am referring to page 14 and 15 of the preliminary hearing transcript.

"Q. Mr. Ramirez, in response to a question, 'When you first came back to Borja Automotive that early morning, did you block the car off at that time, or did you go into the automotive place first?' did you say, 'I went into the automotive place first, I did not block it first'?

"A. I blocked the car. I blocked the car. I entered and—

"Ms. GARROTT: I would move to strike as nonresponsive.

"Would you like me to approach the witness and have the interpreter read each question and answer to him and ask him if he testified to that event?

"THE COURT: Let's do that.

"Mr. Ramirez, at this time the defense attorney is just asking you if you have previously made some statements. I think the easiest thing to do will be if she comes up and shows the interpreter the statement she is asking about and the in-

terpreter will ask you about it. Really the only question right now is did you previously make that statement.

"Let's try it that way.

"Ms. GARROTT: Thank you. May I approach the bench?

"THE COURT: Yes.

"BY Ms. GARROTT: Q. Okay, in the preliminary hearing transcript at page 14 and 15 was a question asked of you, 'When you first came back to Borja Automotive that early morning—'

"A. No, I arrived and then I blocked the car.

"Ms. GARROTT: I would move to strike as nonresponsive your Honor.

"THE COURT: Let's do this: Let's recess for just a moment. Let me see counsel in chambers briefly. . . ."

An *in camera* hearing was held pursuant to Evidence Code sections 402 and 403, on the court's own motion. At the outset the judge said that there was an inability due to the witness's Cuban background to accurately interpret the witness's testimony. Further, that Ms. Garrott's past half hour of attempted impeachment was not producing evidence of probative value:

"I find based upon observations of the witness's demeanor and his apparent inability to answer questions responsibly that the witness is simply being further confused by the references to the preliminary hearing transcript, the accuracy of which I am simply not able to form a conclusion on in the context of this case.

"Accordingly, pursuant to Evidence Code section 352 it is my intention to strike all references to the preliminary hearing transcript and to direct the jurors to disregard that, to simply invite counsel to cross-examine and, in turn, redirectly examine the witness on the events that occurred and simply to conclude with some regret that the preliminary hearing transcript has no evidentiary value either as direct evidence or as an impeachment document. I am simply not satisfied that the witness gave the responses attributed to him or that he understands what is being asked of him."

The interpreter at the preliminary hearing, Richard Nance, testified on behalf of defendant that he accurately translated. He said that when he did have difficulty on several occasions, he stopped the proceeding for clarification and that

Ramirez appeared to understand counsel's questions. Thereafter, the court denied any further use of the preliminary to impeach Ramirez on the basis of Evidence Code section 352, and the jury was instructed to disregard all references to the preliminary transcript.

## DISCUSSION

■ The right of an accused in a criminal case to confront the witnesses against him is a fundamental right secured by the Sixth and Fourteenth Amendments and article I, section 14 of the California Constitution. (*Pointer* v. *Texas* (1964) 380 U.S. 400, 403 [13 L.Ed.2d 923, 926, 85 S.Ct. 1065]; *Davis* v. *Alaska* (1974) 415 U.S. 308, 315 [39 L.Ed.2d 347, 353, 94 S.Ct. 1105].)

Writing for the majority in *Davis*, Chief Justice Warren Burger said, "[C]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." (*Davis* v. *Alaska, id.,* at p. 316 [39 L.Ed.2d at p. 353].)

■ A trial court has broad discretion to exclude evidence pursuant to Evidence Code section 352 if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Jennings* v. *Superior Court* (1967) 66 Cal.2d 867, 877 [59 Cal.Rptr. 440, 428 P.2d 304].) Character evidence may be properly excluded under this section. (*People* v. *Shoemaker* (1982) 135 Cal.App.3d 442, 448 [185 Cal.Rptr. 370], citing *People* v. *Covino* (1980) 100 Cal.App.3d 660, 666 [161 Cal.Rptr. 155].) An appellate court will not disturb a lower court's exercise of discretion under Evidence Code section 352, absent a clear showing of abuse of discretion. (*People* v. *Barrow* (1976) 60 Cal. App.3d 984, 995 [131 Cal.Rptr. 913], disapproved on other grounds in *People* v. *Jimenez* (1978) 21 Cal.2d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672].) However, evidence that is relevant to showing a defendant's innocence is admissible. (*People* v. *Reeder* (1978) 82 Cal.App.3d 543, 553 [147 Cal.Rptr. 275], citing *People* v. *Whitney* (1978) 76 Cal.App.3d 863, 869 [143 Cal.Rptr. 301].) As was stated by Justice Jefferson in *Reeder*, "Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense." (*Id.,* at p. 553.) Still, the proffered evidence must be "competent, substantial and significant." (*People* v. *Northrop* (1982) 132 Cal.App.3d 1027, 1041 [182 Cal.Rptr. 197]; *People* v. *Reeder* (1978) 82 Cal.App.3d 543, 553 [147 Cal.Rptr. 275].)

■ Inclusion of relevant evidence is tantamount to a fair trial. Similarly, exclusion of prejudicial evidence can safeguard the defendant's rights as much as

that of the prosecution. (*People* v. *Shoemaker* (1982) 135 Cal.App.3d 442, 448 [185 Cal.Rptr. 370].) Indeed, discretion should favor the defendant in cases of doubt because in comparing prejudicial impact with probative value the balance "is particularly delicate and critical where what is at stake is a criminal defendant's liberty." (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405, 484 P.2d 77]; *People* v. *Murphy* (1963) 59 Cal.2d 818, 829 [31 Cal.Rptr. 306, 382 P.2d 346].)

■ The question of the propriety of excluding the use of a preliminary hearing for impeachment purposes, on the basis that the interpretation is not accurate, appears to be one of first impression. There are many potential problems when one person interprets the words of another. The problem of accuracy was raised in *People* v. *Keller* (1927) 83 Cal.App. 190, 195 [256 P. 829]. The defendant in that case objected to the reading of a transcript to the jury on the basis that the official stenographer, who took the testimony at the first trial of the then unavailable witness, had not compared the entire transcript with his shorthand notes. On appeal the court presumed the official duty had been performed.

Pursuant to Evidence Code section 752, an interpreter will be sworn to testify when a witness cannot adequately and verbally communicate in English. Moreover, Evidence Code section 750 states that "A person who serves as an interpreter or translator in any action is subject to all the rules of law relating to witnesses." *People* v. *Johnson* (1975) 46 Cal.App.3d 701 [120 Cal.Rptr. 372], held that it was prejudicial error to deny use of evidence that defendant offered to show that there were significant errors in translation between what a witness testified to at the preliminary hearing and what was translated as that being that witness's testimony. It was observed that "One subsidiary holding in this case that is of significance is that an interpreter in an action is a witness and is, therefore, subject to all of the rules of law relating to witnesses generally." (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 8.2, p. 299.) The appellate court also did not view the contention as controlling that the competency of an interpreter was limited to attack at trial because there was no opportunity to do so at trial. This may be the situation even though challenge to the adequacy of interpretation would obviously be raised at trial. (*People* v. *Chi Ko Wong* (1976) 18 Cal.3d. 698, 725 [135 Cal.Rptr. 392, 557 P.2d 976]; *People* v. *McNeal* (1954) 123 Cal.App.2d 222 [266 P.2d 529].) Further, it is within the trial court's discretion to determine whether a challenge to an interpreter's competency at trial is justified. (See *People* v. *Mendes* (1950) 35 Cal.2d 537, 543 [219 P.2d 1].)[8]

---

[8]In discussing the necessity of interpretation, the following was recounted in 3 Wigmore on Evidence (3d ed. 1970) section 811, page 277, footnote 1: "The following anecdote illustrates the need of caution: O'Regan's Memoirs of John Philpott Curran, 29: 'An Irish witness, Mr. Curran said, was called on the table to give evidence, and having a preference for his own

The trial court's ruling was based on a finding that the use of the preliminary transcript to impeach Ramirez would result in prejudice that outweighed its probative value. The trial judge expressed concern that Ramirez was being questioned regarding statements made at a preliminary hearing that he said were inaccurate because Ramirez may not have made them. He expressed further concern after the *in camera* hearing that there was insufficient evidence to show that the use of the preliminary hearing was more probative than prejudicial.

There is no evidence in the record to support a finding that the interpretation of the preliminary hearing was inaccurate. Therefore, it was speculative for the trial court to conclude that prejudice outweighed probative value in defense counsel's use of the preliminary hearing transcript to impeach Ramirez. In two instances the interpreter apparently interrupted the preliminary hearing because of the witness's Cuban accent and because of the witness's quickness of speech:

"THE INTERPRETER: And then a few words I didn't understand.

". . . . . . . . . . . . . . . . . . . . . .

"THE INTERPRETER: Would you repeat?

"I'm sorry, I'm having a hard time keeping up because I'm not used to his Cuban manner of speaking and accent.

". . . . . . . . . . . . . . . . . . . . . .

"THE INTERPRETER: Okay, I'm having a little trouble with the witness because he just goes on and on and on and I can't keep up with all of it."

During the *in camera* hearing, the interpreter acknowledged under oath that he had some trouble interpreting what Ramirez said but during those instances he informed the court of the difficulty and the proceedings were then stopped. Nance also said he accurately interpreted what the witness said and that the witness did not express difficulty understanding the questions. ██ An interpreter's problems in translating are not in themselves sufficient to rebut a presumption that his "official duty" was regularly performed pursuant to

---

language (first, as that in which he could best express himself, next, as being a poor Celt he loved it for its antiquity, but above all other reasons, that he could better escape cross-examination by it), and wishing to appear mean and poor and therefore a mere "Irish," he was observed on coming into court to take the buckles [tongue] cunningly out of his shoes. The reason of this was asked by counsel, and one of the country people, his opponent in the suit, cried out, "The reason, my lord, is that the fellow does not like to appear to be *master of two tongues.*" ' "

Evidence Code section 664. (*People* v. *Keller* (1927) 83 Cal.App. 190, 195 [226 P. 829].)

■ A review of the record further reveals that Ramirez was a challenging witness to interview on both direct and cross-examination, for he did not always respond to the questions he was asked and he would try to explain his answers—both characteristics an English-speaking witness might display. The difficulty that defense counsel encountered in questioning Ramirez may have been time consuming and at times confusing. Yet, these reasons are insufficient justifications for restricting confrontation of Ramirez, particularly in view of the discrepancies between his testimony at the preliminary hearing and trial. For example, there was a conflict in his testimony as to whether he blocked defendant's car before or after he entered the shop; whether he identified appellant as inside or outside the shop, since Ramirez said he saw two persons at the scene of the robbery, only one of whom he could identify. The prosecutor questioned the interpreter about some of these conflicting statements and the interpreter recollected that his translations were accurate.

The exclusion of the evidence was prejudicial to the defendant in that it prevented him the benefit of vigorous and full cross-examination, in contravention with his fundamental right to a fair trial as guaranteed by the Sixth Amendment. As was stated in *Davis* v. *Alaska* (1974) 415 U.S. 308, 317 [39 L.Ed.2d 347, 354, 94 S.Ct. 1105], "We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so they could make an informed judgment . . . ." In addition, the trial court's admonition to the jury may have amounted to more prejudice than would the delay in time caused by allowing a full cross-examination.

## II

■ Appellant argues that the court incorrectly instructed the jury pursuant to CALJIC No. 2.62.[9]

---

[9] "In this case defendant has testified to certain matters.

"If you find that he failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable.

"In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain such evidence.

"The failure of a defendant to deny or explain evidence against him does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt."

At issue was defendant's "failure" to explain the appearance of his fingerprints on a flashlight allegedly not present on the premises prior to the robbery.

Though appellant explained that he had been in the shop a few days earlier and had handed tools to his friend with whom he was visiting, he failed to recall having touched the flashlight. The prosecution deemed this "gap" in defendant's case as warranting application of CALJIC No. 2.62 in that defendant did not explain why his fingerprints appeared on the flashlight.

Of primary importance to the application of CALJIC No. 2.62 is whether the facts or evidence that defendant allegedly fails to explain or deny are within defendant's knowledge. (*People* v. *Saddler* (1979) 24 Cal.3d 671, 682-683 [156 Cal.Rptr. 871, 597 P.2d 130]; *People* v. *Peters* (1982) 128 Cal.App.3d 75, 85 [180 Cal.Rptr. 76].) Obviously, if defendant admitted having touched tools in the shop days prior but could not specifically remember the flashlight, and in addition denied having been in the shop that evening, he could not disclose any further facts that would shed light on his innocence. We conclude, therefore, that there was no support in the record for the giving of the instruction.

While the court erred in giving CALJIC No. 2.62, such error alone does not mandate reversal. Only if a reviewing court, after examining all the evidence, determines that it is reasonably probable that the trial court would have found in favor of the appealing party but for the error, should the judgment be reversed. (*People* v. *Peters* (1982) 128 Cal.App.3d 75, 86 [180 Cal.Rptr. 76].) Given that appellant's first contention warrants a reversal of the judgment, this court need not make such a determination.

DISPOSITION

The judgment is reversed.

Spencer P. J., and Lillie, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 25, 1983. Richardson, J., was of the opinion that the petition should be granted.