Filed 8/17/15  P. v. Neff CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>LaDONTE ABRION NEFF,<br><br>  Defendant and Appellant. | A140121<br><br>(Contra Costa County<br>Super. Ct. No. 51300102) |

Defendant LaDonte Abrion Neff was sentenced to state prison for the aggravated term of five years after a jury found him guilty as charged of a single count of second degree robbery.  On this timely appeal, he contends the trial court erred by refusing to instruct on the lesser-included offense of assault, and by permitting the victim of a prior robbery to testify with the aid of a competent interpreter.  We reject both contentions, and affirm.

**BACKGROUND**

The circumstances of the offense are not complicated and not really in dispute. Viewing the evidence most favorably to the prosecution (*People v. Manibusan* (2013) 58 Cal.4th 40, 87), the trial record shows the following:

In November 2013, Leonardo Macedo was working with his contractor father at a house in Antioch.  Macedo was returning to the house after an errand when he was approached by two Black males—one of whom was defendant—and two Black females. Without warning, defendant struck Macedo in the face, knocking him to the ground. While Macedo was on the ground, defendant was kicking him and demanding, "What's

1

in your pocket?" Macedo made no response. Defendant continued kicking Macedo. Eventually, defendant reached into Macedo's pants pocket and removed a cell phone.

The two females disappeared when the attack began. The other male pulled defendant off Macedo and led him away.

A passing motorist observed the entire attack. He corroborated most of Macedo's version. Once defendant and the other male left the scene, the motorist notified police and helped to apprehend defendant. Defendant was detained immediately after disposing of a cell phone, which was retrieved. Macedo was brought to the scene, and identified both defendant as the attacker and the cell phone as the one taken from him.

According to the apprehending officer, after being taken into custody defendant said he was "upset due to his friend being recently locked up and the recent death of his great-grandmother. [¶] He said he was . . . consuming alcohol and he saw a subject, a Hispanic male. And he wanted to take out his anger on that person, so he approached the subject, punched him. The subject fell. [¶] He punched the subject several more times. And then subsequently took a phone from the subject's pants pocket."

Geronimo Martin testified about his being the victim of an armed robbery in March 2011. Martin was on an Oakland street when two men approached. One of the two pointed a gun at Martin while the other took money from Martin's pants pocket. The two men were soon detained, and Martin was brought to the detention scene. He identified defendant as the one who held the gun, and defendant's cousin, DeVonte Neff, as the one who took his money. In the apartment where defendant was apprehended, police found a gun, which Martin identified as the one pointed at him by defendant.

Defendant testified at the trial, admitting to an alcohol-induced, unprovoked attack on Macedo. The only significant divergence from what he told police was about the phone: "When I . . . punched him and he hit the ground, I seen the phone come out. But, like, when I first hit him, I didn't have no intention of taking his phone. But in the heat of the moment, I seen it there, I picked it up after everything was done. . . . I wasn't planning on robbing him. It was just when I seen it on the ground in the heat of the

2

moment, I picked it up." Defendant did not recall asking Macedo, "What's in your pockets?"

Defendant further testified that he was not involved in robbing Martin, but he admitted to doing so because "my attorneys told me the best thing to do was . . . get a plea deal. So that's what I did. The 2011 robbery of Martin was alleged as a prior "strike" conviction. The jury found the allegation true, but the finding was stricken at the time of sentencing.

## REVIEW

### There Was No Instructional Error

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Pen. Code, § 211.) "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240.) Defendant first contends that the trial court erred in refusing his request that the jury be instructed on assault as a lesser included offense of the robbery of Macedo. Defendant is mistaken.

"A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. [Citation.] This sua sponte obligation extends to lesser included offenses if the evidence 'raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense. [Citations.]' [Citations.] . . . 'A criminal defendant is entitled to an instruction on a lesser included offense only if [citation] "there is evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser.* [Citations.]' [Citation.]

"The requirement that courts give sua sponte instructions on lesser included offenses 'is based in the defendant's constitutional right to have the jury determine every material issue presented by the evidence. [Citations.]' [Citation.] This sua sponte duty to instruct exists even if the defendant expressly objects to the instruction. [Citation.] . . . ' "[A] defendant has no legitimate interest in compelling the jury to adopt an all or

3

nothing approach to the issue of guilt.  Our courts are not gambling halls but forums for the discovery of truth."  [Citation.]'  [Citations.]  [¶] . . . [¶]

"To determine whether a lesser offense is necessarily included in the charged offense, one of two tests (called the 'elements' test and the 'accusatory pleading' test) must be met.  The elements test is satisfied when ' "all the legal ingredients of the corpus delicti of the lesser offense [are] included in the elements of the greater offense." [Citation.]'  [Citations.]  Stated differently, if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.  [Citations.]

"Under the accusatory pleading test, a lesser offense is included within the greater charged offense ' "if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed." [Citation.]'  [Citations.]"  (*People v. Lopez* (1998) 19 Cal.4th 282, 287–289.)

More than 30 years ago, our Supreme Court held that "because a defendant can commit robbery without attempting to inflict violent injury, and without the present ability to do so, robbery does not include assault as a lesser offense."  (*People v. Wolcott* (1983) 34 Cal.3d 92, 100.)  More recently, it stated:  "Because a robbery can be committed strictly by means of fear, assault is not a lesser included offense of robbery under the elements test."  (*People v. Parson* (2008) 44 Cal.4th 332, 349 [citing *Wolcott*].)  This, defendant concedes.

But no court has held that assault is a lesser-included offense of robbery under the accusatory pleading test.  Our Supreme Court has gone no further than assuming that assault could be a lesser-included under the accusatory pleading test.  (*People v. Parson*, *supra*, 44 Cal.4th 332, 350; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 127.)  This is where defendant makes his stand.

The information filed against defendant read:  "The District Attorney of the County of Contra Costa hereby accuses LaDonte Abrion Neff, Defendant, of the crime of felony, a violation of Penal Code Section 211/212.5(c) (Second Degree Robbery),

4

committed as follows: [¶] On or about November 25, 2012, at Antioch, in Contra Costa County, the Defendant, LaDonte Abrion Neff, by means of force and fear, did unlawfully take personal property from the person, possession and immediate presence of Leonardo Macedo." Based on this language, defendant reasons: "[T]his accusatory pleading charged appellant with robbery by 'force *and* fear.' By alleging that appellant used force, the information necessarily alleged all the elements because in the assault statute the terms force and violence mean the same thing. It has long been established that ' "[t]he term 'violence' as used [in section 240] is synonymous with 'physical force' and in relation to assaults the two terms are used interchangeably." ' [Citations.] So the allegations that appellant used force in the robbery also constituted the allegation that appellant used violence, which necessarily involves a successful attempt and present ability to use violence. That made assault a lesser included offense in the robbery alleged here."

This reasoning was rejected by the Third District in 1996:

"Courts have recognized that the 'force' required for robbery is not necessarily synonymous with a physical corporeal assault. [Citation.] An assault consists of an attempt coupled with the present ability to inflict an 'injury unlawfully on another; this 'injury' can be the least unwanted touching. [Citation.] When *actual* force is present in a robbery, at the very least it must be a quantum more than that which is needed merely to take the property from the person of the victim, and is a question of fact to be resolved by the jury taking into account the physical characteristics of the robber and the victim. [Citations.] The force need not be applied directly to the person of the victim. [Citation.] If 'force' for purposes of robbery meant no more than the direct (or indirect) application of physical might to the person of the victim, then we would agree that an assault is necessarily included any time a prosecutor alleges a robbery was committed by means of force. 'Force,' however, has a broader meaning.

"Generally, 'the force by means of which robbery may be committed is either actual or constructive. The former includes all violence inflicted directly on the persons robbed; the latter encompasses all . . . means by which the person robbed is put in fear

5

sufficient to suspend the free exercise of . . . will or prevent resistance to the taking.' [Citation.] This 'constructive force' means 'force, not actual or direct, exerted upon the person robbed, by operating upon [a] fear of injury. . . .' [Citation.] The Supreme Court has held that 'force' has no technical meaning which must be explained to jurors. [Citation.] Included within the common meaning of 'force' is 'such *threat* or *display* of physical aggression toward a person as *reasonably inspires fear* of pain, bodily harm, or death.' [Citation.]

"As we have noted, 'force' is not an element of robbery independent of 'fear'; there is an equivalency between the two. ' "[T]he coercive effect of fear induced by threats . . . is in itself a form of force, so that either factor may normally be considered as attended by the other." ' [Citation.]

"Thus, in a case where the information pled robbery in the conjunctive and the defendant claimed there was insufficient evidence of both elements, we held that pointing a handgun at a victim and demanding money is direct evidence of force and is 'inferably' evidence of the victim's fear. [Citation.] Notably absent from this statement of the evidence supporting the implied finding of force is any indication of an attempt to apply physical force rather than frighten, or any indication the handgun was loaded (and thus had the present ability to apply force when used as a gun).

"Since the element of force can be satisfied by evidence of fear, it is possible to commit a robbery by force without necessarily committing an assault. Consequently, under the 'accusatory pleading' test, assault is not necessarily included when the pleading alleges a robbery by force. As a result, the trial court had no duty to instruct *sua sponte* on assault as a lesser-included offense of robbery . . . ." (*People v. Wright* (1996) 52 Cal.App.4th 203, 210–211, fn. omitted.)

With commendable candor, defendant does not shy away from confronting *Wright*, and presents a well-written detailed, three-part argument on its logic. But he is unable to muster a single reported decision that has disagreed with *Wright's* reasoning. And it appears sound to us.

Even if we were inclined to dispute *Wright*, there is another impediment to reversal. "A trial court must instruct sua sponte on a lesser included offense 'only if there is substantial evidence to support a jury's determination that the defendant was in fact *only* guilty of the lesser offense.' " (*People v. Bacigalupo*, *supra*, 1 Cal.4th 103, 127; accord, *People v. Moye* (2009) 47 Cal.4th 537, 553; *People v. Parson*, *supra*, 44 Cal.4th 332, 348–349; *People v. Breverman* (1998) 19 Cal.4th 142, 162.) It must be remembered that the charged offense of robbery is not only a crime of violence, it is also a crime of larceny. (*People v. Gomez* (2008) 43 Cal.4th 249, 264 ["Although classified in the Penal Code as a crime against the person, robbery is actually a crime against both the person and property"]; *People v. Bonner* (2000) 80 Cal.App.4th 759, 763 ["Robbery is both assaultive and larcenous and is a crime against property and persons"].)

So, what is the likelihood that the jury would convict defendant of assault but not robbery? We think it next to inconceivable, because to convict defendant *only* of assault the jury would have had to disregard the unanimous evidence—including defendant's trial testimony—that he did indeed take Macedo's cell phone. The jury also rejected the idea that defendant's consumption of alcohol prevented his forming the specific intent needed for robbery, in the language of CALCRIM No. 3426—"the specific intent to permanently deprive the owner of his property." (See *People v. Butler* (1967) 65 Cal.2d 569, 573 ["a specific intent to steal . . . is an essential element of robbery"].) The jury rejected the defense argument that "you must acquit the defendant if you find the decision to take the property came after the force or fear" because "he did not take that property as a part of the assault itself." And the jury declined the options of convicting defendant of the lesser-included of attempted second degree robbery or petty theft. The jury thus refused to disassociate the attack from the loss of property, refused to view what happened to Macedo as just a physical attack or as merely the loss of property. There is no basis to believe that giving the physical attack a different label would have persuaded the jury to make that disassociation, looking only at the attack, and ignoring what defendant's counsel point blank told the jury in closing argument: "Here's a fact. LaDonte Neff took Leonardo Macedo's phone." In these circumstances, we would have

7

to conclude that even if the claimed error did occur, it would have been harmless according to any standard for prejudice.

### There Was No Error in Failing to Replace the Interpreter

Geronimo Martin testified with the aid of a Spanish interpreter. As Martin's testimony progressed, it soon became apparent there was some problem when the interpreter asked the court "is it possible to have a sidebar? I have some questions about this." After the sidebar, the following transpired:

"THE COURT: All right. Let's do this. Let's inquire of the witness what his first language is.

"THE WITNESS: Mam.

"THE COURT: And what is that?

"THE WITNESS: Mam is my language.

"THE COURT: And for the record, does the interpreter know where the language originates?

"THE INTERPRETER: Your Honor, without being an expert on languages, it is a Mexican—a language that is spoken in parts of—I believe of southern Mexico and Central America, but I'd have to inquire directly from the witness.

"THE COURT: Why don't you do that.

"(Off-the-record discussion between the interpreter and the witness.)

"THE INTERPRETER: In Guatemala.

"THE COURT: All right. So are you still able to translate his language for these proceedings?

"THE INTERPRETER: The interpreter believes that he can interpret the Spanish spoken by the witness even though there are clear mannerisms in his speech that are not consistent with proper Spanish—mainstream Spanish as used in Mexico. So to the extent that there might be some incorrect Spanish structure, grammar, syntax, I still believe I can interpret the Spanish of the witness.

"THE COURT: All right. Fine.

"MS. GRAY [defense counsel]: Judge, I'm not satisfied that we've made a complete record of what was stated at sidebar.

"THE COURT: We can do that outside the presence of the jury.

"MS. GRAY: Well, I suggested that at sidebar, but I'm sorry Judge, I just—I don't think we're getting accurate testimony [*sic*]. And—

"THE COURT: Well—

"MS. GRAY: And that he may need to inquire—

"MR. O'CONNELL [prosecutor]: Your Honor, I'm going to—

"MS. GRAY: Inquire as to the witness's fluency or lack of fluency in Spanish. And I am willing to have this discussion outside the presence of the jury but—

"THE COURT: I think it goes to the weight rather than the admissibility. If this witness . . . speaks a language which the interpreter can translate, despite issues of syntax, I think it's perfectly appropriate to continue. So—

"MS. GRAY: I do object. This interpreter is not certified in Mam.

"THE COURT: I understand the objection. It's overruled. The jury will understand that there may be some gradations in terms of syntax or exact grammar, but the interpreter who is certified has told this Court that he is capable of translating, so I'm going to allow him to proceed. [¶] So let's have a question, please, and let's make the questions as simple as possible."

The first question of Ms. Gray's cross-examination of Martin was, "Do you speak Spanish or Mam at home?" Martin answered, "Mostly Mam, but I—I do always understand Spanish." After a few more questions the jury was excused for lunch, the court stated it wanted "recorded . . . what you told us at the bench." The interpreter then stated at greater length the conclusion that Spanish was not Martin's first language. The court then had the interpreter "clarify . . . your obligation regarding the interpretation of his [Martin's] language." After the interpreter did so, the court inquired, "And would you or is it your obligation to inform the Court if you cannot translate that language accurately?" The interpreter responded as follows:

"Yes, your Honor. I would have informed the Court if I felt like I was unable to understand or if I felt like there was any indication that—beyond what I already pointed out to the Court that the witness was not understanding or that I was not understanding. [¶] If it got to the point where I felt like there were simply no communication occurring, then I would be obligated to notify the Court."

The court asked, "Did you at any point feel that you could not perform the translation accurately?" The interpreter replied: "At the beginning it wasn't clear to me if—well, it was clear to me that he was using improper grammatical structure and syntax, but I do believe that even though at first it seemed to me there was some miscommunication because he was adding sounds and words in his responses, I do believe that he was able to understand the questions and he was able to—and I was able to understand his responses and that they were responsive."

The court then asked, "And do you believe that you can continue to translate in the afternoon session?" The interpreter's answer was: "I believe I can continue interpreting in the afternoon session. And if I do observe any indication that there is failure of communication, either because I don't understand the witness's testimony or because he doesn't understand my interpretation of the questions, I will notify the Court."

Defense counsel continued to object. "The issue is not [the interpreter's] qualifications or good faith in translating what he hears in Spanish. The question is whether the witness is comprehending questions that are put to him in Spanish. [¶] . . . [¶] I'm not challenging at all that our interpreter is accurately bringing the Spanish words into English, but the problem is whether the witness is comprehending questions in Spanish accurately. [¶] . . . [¶] That he is not sufficiently fluent in Spanish. . . . [¶] . . . [I]f he's not understanding Spanish at the level that a courtroom witness needs in order to provide responsive answers, I can't cross-examine him using only a Spanish interpreter. I need a Mam interpreter."

The court then ruled on the defense objection as follows: "Well, I would agree with you except on your cross-examination, Ms. Gray, in response to your question he [Martin] said that he converses at home in Mam but also in Spanish, and that when he

10

spoke with Mr. Reyes who was his work companion that he also spoke with him in Spanish.  So I don't think it's a typical situation where the person is fluent only in his own dialect.

"It appears to me, from even listening to his answers, once the questions got asked in a more simplistic fashion, that he understood perfectly and he responded appropriately.

"So the record is made.  I note your objection.  And I overrule it."

Defendant treats the overruling of his objection as a violation of a number of constitutional rights, specifically:  "The trial court deprived appellant of his rights to due process, confrontation of witnesses, cross-examination and presence at trial by allowing a critical witness to testify in Spanish, his weak second language, instead of Mam, his native language and by refusing to provide a Mam Interpreter."  Defendant includes within this contention the assertion that the trial court "failed to comply with the applicable statute [i.e., Evid. Code, § 752, subd. (a)] and Court rules [i.e., Cal. Stds. Jud. Admin., § 2.10(b)]" by not asking the witness "his name, address, birth date, age, place of birth, active vocabulary in vernacular English, and understanding of the court proceedings in order to determine the need for an interpreter."  We are not persuaded.

Initially, we note that these arguments are largely being advanced for the first time.  With the possible exception of the cross-examination ground ("I can't cross-examine him using only a Spanish interpreter"), none of the grounds now urged was advanced to the trial court.  They consequently cannot be put forward for the first time on appeal.  (*People v. Abel* (2012) 53 Cal.4th 891, 924.)  As for the court's supposed failure to question the witness, that seems academic because the need for an interpreter was accepted by all concerned from the outset.

However, if, solely for purposes of this discussion, the merits of defendant's contention had been preserved for review, they could not be sustained.

Without question, the need of a non-English speaking witness for a competent interpreter is essential for satisfying constitutional due process.  (See, e.g., Cal. Const., art. I, § 14; *People v. Rodriguez* (1986) 42 Cal.3d 1005, 1010; Evid. Code, § 752.) Defendant points to a couple of questions at the start of the witness's direct examination

11

as proof "that he did not understand the Spanish interpreter." This is far too broad a characterization. The examples occurred when the witness's unease and nervousness would be most pronounced. It is apparent from an examination of the transcript of the witness's entire testimony that, while never completely relaxed, he became adjusted to the proceeding. The stress did not disappear, so there were, in defendant's words, "several other incidents of misunderstanding." This is overstating the matter. The incidents covered by defendant's generic reference ("See 1 RT 197:26-198:1, 198:6-8; 210:22-211:7; 211:18-28; 213:20-21; 215:17-23") reflect momentary hesitation, not enduring incomprehension.

For example, the final citation shows defense counsel questioning the witness as follows:

"Q. On Exhibit 17, does that gun have a brown handle or a red handle?

"A. No, the other one. Brown.

"Q. Okay. You don't think that handle is brown, do you?

"A. Well, when you get scared, you can't see very well."

In another example, defendant cites only the first two lines of the exchange that occurred only moments before:

"Q. What color is the gun in People's 17?

"A. That's the one that the brown guys had.

"Q. By 'brown guys' do you mean African-American guys?

"A. Yes.

"Q. What is the color of the gun?

"A. It's brown.

"Q. Is the handle of the gun the same color as the barrel?

"A. No, it's different.

"Q. What color is the handle?

"A. It's brown.

"Q. What color is the barrel?

"A. Like gray almost."

12

Another example shows only a brief and transitory confusion. Again, defendant cites only the third and fourth lines of the following:

"Q. Can you tell me what clothing that second man was wearing?

"A. Well, the pants of the second man also had pants with stripes in the back.

"Q. And was he—what race was he, the color of his skin?

"A. It was I think white behind the black pants.

"Q. I want to know about his race, though, sir. Was he Mexican? Was he Black? Was he White? Was he Asian?

"A. That one was Black."

Finally, one of the instances cited by defendant shows the interpreter candidly telling the court, "The interpreter didn't understand the witness's response. I'd like to ask him to repeat it, please." The answer was repeated, and defense counsel proceeded with her cross-examination.

Defendant's contention is in essence an attack on both the interpreter's competence and the trial court's decision not to replace him. "The question of an interpreter's competence is a factual one for the trial court." (*People v. Aranda* (1986) 186 Cal.App.3d 230, 237.) "[I]t is within the trial court's discretion to determine whether a challenge to an interpreter's competency at trial is justified." (*People v. De Larco* (1983) 142 Cal.App.3d 294, 306.)

Even more important than what is in the record is what is not, namely, anything from the witness indicating an inability to understand the interpreter. The trial court accepted the interpreter's representation that he would notify the court of "any failure of communication, either because I don't understand the witness's testimony or because he doesn't understand my interpretation of the questions." Defendant presents no reason why this court should assume the interpreter violated that promise. The test for reversal is "whether an actual material interference with the defendant's rights [to a competent interpreter] has been shown." (*People v. Rodriguez, supra,* 42 Cal.3d 1005, 1014, fn. 6.) Here, no "actual material interference" has been established.

13

## DISPOSITION

The judgment of conviction is affirmed.

                                         _____

                                         Richman, Acting P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.