Filed 2/8/16  P. v. Hogan CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>FRANK WILLIAM HOGAN,<br><br>Defendant and Appellant. | F067407<br><br>(Super. Ct. No. MCR032690)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

After being identified by means of a cold DNA match eight years after the crime, Frank William Hogan was found guilty of the first degree murder and forcible sodomy of Linda Richards.  He was sentenced to life without the possibility of parole.  Hogan now

argues the trial court erroneously excluded evidence important to his defense: that Richards might have been one of the prostitutes with whom he had sex during the period in question, that he did not attack her, and that she must have been murdered by someone else afterward. He also says one item of prosecution evidence was erroneously admitted and two jury instructions were improper.

Some of the excluded evidence related to the amount of time that passed after Hogan's semen was deposited in Richards's body and before she died. Other excluded evidence pertained to the question of whether Richards might have been sodomized with a foreign object sometime after Hogan had anal sex with her. Also excluded was matter relevant to Hogan's character for not engaging in sexual violence and to rebutting evidence of Richards's character for being orderly, dignified, and law abiding. The challenged prosecution evidence was a false statement Hogan made to police about his prior domestic violence.

We hold that, in each of these evidentiary rulings, the trial court erred. We also agree about one of the jury instructions.

Without the erroneously excluded material, Hogan's defense was simply a rather implausible story according to which he had the misfortune of having sex with a stranger and leaving his DNA a short time before she was sexually assaulted and murdered by another person who did not leave any DNA. With the excluded material it would still have been an implausible story, but it would have been supported by some evidence— including some expert medical evidence—independent of Hogan's own self-serving testimony. The jury might have been influenced by this evidence had it been presented. The erroneous admission of the false statement could also have had a significant negative impact on the jury's impression of Hogan's credibility. Without the erroneous jury instruction—which suggested to the jury an inference of consciousness of guilt unsupported by the evidence—Hogan's chances of being believed would have been still greater.

Though the issue is close, we find the errors were cumulatively prejudicial.  It is reasonably probable that, absent these errors, Hogan would have obtained a better outcome at trial, so reversal is warranted under the state-law standard of *People v. Watson* (1956) 46 Cal.2d 818.  We need not analyze Hogan's further contention that the rulings infringed his federal constitutional right to present a defense.

The judgment will be reversed and the case remanded for a new trial.

## *FACTS AND PROCEDURAL HISTORY*

Richards was middle-aged and homeless at the time of her death.  For two or three weeks in the summer of 2000, she was seen nightly sleeping in the doorway of a chiropractor's office near downtown Madera.  On the morning of September 1, 2000, an employee came to work at the office and found blood, a bloody pillow, and a pair of shoes in the doorway.  A trail of blood led from the doorway around the corner of the building.  The employee found Richards's body at the side of the building.

Richards's lower body was unclothed.  A pair of underwear and a pair of pantyhose were found under her.  Her legs were spread, her dress and slip were pushed up above her breasts, and her mouth was gagged with a scarf.  A blanket covered her head.  Between her legs, the dirt on the ground was disturbed, as if someone had been positioned there.  On the ground near Richards's anus was a clear fluid.  Several pages from a pornographic magazine were on the ground near her feet and additional pages were in a trash can nearby.  Also on the ground were three, one-foot logs taken from a nearby woodpile.  In an adjacent yard was a small baseball bat.

An autopsy led to the finding that Richards died from multiple blunt force injuries to the head.  These included at least two blows to the back of the head resulting in a large depressed skull fracture, seven inches by four inches across.  There were numerous other wounds on the front and back of the head.  Richards died within an hour, and probably within 30 minutes, of the infliction of the injuries.

The autopsy also revealed evidence of the sexual assault. There was tearing at the edge of the anus and blood coming from the rectum (i.e., the lower part of the colon). On the rectum there was a two-inch area of bruising. Sperm cells were found on swabs from the rectum. The vagina was reddened but not injured and swabs from it contained no sperm. There was a bite mark on Richards's right breast.

DNA from the sperm cells was analyzed in 2001 and the results were entered into several databases. A possible match with Hogan's DNA profile was found in 2008. After additional testing, the match was confirmed.

Hogan was living in Oregon in 2008, but he lived in Madera at the time Richards was killed. Police arrested Hogan and transported him from Oregon to the Madera County jail. When officers asked him to explain why his sperm was found inside Richards's body, Hogan said that when he lived in Madera, he patronized prostitutes who worked downtown, and Richards was probably one of them. He did not remember Richards, however, and denied killing her.

The district attorney filed an information charging Hogan in count 1 with murder (Pen. Code, § 187)[1] and in count 2 with forcible sodomy (§ 286, subd. (c)(2)). In connection with count 1, the information alleged the murder was committed under a special circumstance, namely, that Hogan committed it while committing sodomy (§ 190.2, subd. (a)(17)). In connection with count 2, the information alleged the offense qualified for enhanced punishment under the One Strike law (§ 667.61) because Hogan inflicted great bodily injury and used a dangerous or deadly weapon. Finally, as to both counts, the information alleged sentence enhancements applied because Hogan inflicted great bodily injury (§ 12022.8) and used a deadly weapon (§ 12022, subd. (b)(1)).

At trial, a criminalist testified about the DNA evidence. He said the DNA profile from a sample of Hogan's blood matched the DNA profile from the sperm cells found in

---

[1]Subsequent statutory references are to the Penal Code unless otherwise noted.

4.

Richards's body. A forensic dentist testified about the bite mark, but he drew no conclusions about the identity of the person who inflicted it. Based on the evidence, he could neither identify nor exclude Hogan as the person who did it.

Several witnesses gave testimony for the prosecution relevant to the issues of when Richards was killed and when Hogan's sperm was deposited in her body relative to the time of death. A neighbor who lived next door to the chiropractor's office testified she had often seen Richards sleeping in the office doorway. On the night before Richards's body was found, the neighbor saw Richards prepare her bedding and lie down in the doorway around 10:00 p.m. The neighbor woke up around 3:30 or 4:30 a.m. to prepare a lunch for her husband to take to work and thought she saw Richards still lying in the doorway. The neighbor went back to bed. (A detective testified that he interviewed the neighbor the day the body was found, and the neighbor said then that she had indeed seen Richards still sleeping in the doorway around 4:15 a.m.) When the neighbor arose again around 7:30 to help her children get ready for school, Richards was gone, but her shoes or blanket had been left behind. The chiropractor's employee found the body and called the police between 8:00 and 8:30 a.m.

Dr. Stephen Avalos, who performed the autopsy, testified he examined Richards's bruised rectal tissue and studied a sample with a microscope. What he found had implications for the time the anal intercourse took place. First, the fact that there was a bruise indicated the impact to the rectum took place while Richards was alive, since a bruise can be formed only if the heart is pumping blood. Second, there were no neutrophils at the site of the bruise. Neutrophils are a type of white blood cells that are normally delivered by the bloodstream to the site of an injury. Their absence from the bruise site was an indication that Richards died shortly after sustaining the bruise, as their failure to arrive would be explained by the stopping of the heart and the cessation of blood circulation. Avalos opined that neutrophils usually arrive within 15 to 20 minutes of the time of an injury, assuming the heart is beating. He also stated, however, that he

was aware of the opinion of some researchers that the arrival of neutrophils can take a few hours, and "it can be very difficult to assign a specific time frame .…"

The prosecutor also asked Avalos whether he thought the bruise had been caused by a penis. He replied that he was "not … willing to state that it was not," but it also could have been caused by something else.

On cross-examination, defense counsel began to ask a question about neutropenia.[2] The court called counsel to the bench for a conference off the record. When the cross-examination resumed, counsel did not ask a question about neutropenia. He did ask whether there were medical conditions besides death that could cause a lack of neutrophils. Avalos said yes: "[T]here may be a host of things that might prevent the bone marrow from making neutrophils .…" But he did not investigate them in this case.

Later, the court and parties had a discussion on the record about why the court barred the question about neutropenia. The court stated as a "foundational prerequisite" to asking a question about neutropenia, the defense would have to present evidence that Richards had neutropenia. Without this evidence, testimony about neutropenia was "not relevant." Defense counsel began to explain that if he asked the witness about neutropenia, the witness could say what the consequences would be if someone had it. The court replied, "No. We're not going to ask about neutropenia until you assure me in good faith that you have evidence that the victim had that condition." When the cross-examination resumed, the following exchange took place:

> "[Defense counsel:] Earlier I asked you, 'Have you heard the word neutropenia?' N-E-U-T-R-O-P-E-N-I-A.
>
> "[Avalos:] Yes.
>
> "[Defense counsel:] Do you know what that is?

---

[2]"[T]he presence of abnormally small numbers of neutrophils in the circulating blood." (Stedman's Medical Dictionary (25th ed. 1990) p. 1051, col. 1.)

"[Avalos:]  Yes.

"[Defense counsel:]  Okay.  Did you examine for that in this victim?

"[Avalos:]  No.

"[Defense counsel:]  And what does it mean, generally?

"[Prosecutor:]  Objection.  Relevance.

"THE COURT:  Sustained."

Subsequently defense counsel asked:  "Can malnutrition cause a slow response of neutrophils to a site?"  The court sustained the prosecutor's objection.

On redirect, the prosecutor followed up on an exchange during cross-examination in which Avalos reiterated that he could not say whether the injuries to the rectum and anus were caused by a penis or another object.  The prosecutor asked whether Avalos had ever seen a case in which someone was sodomized with an object other than a penis.  Avalos had encountered one case in which a victim was sodomized with a wine bottle.  The injury to the rectum was more severe in that case; the bottle perforated the rectum and damaged internal organs.  The prosecutor asked whether Avalos found any "splinters," "glass," or "other items" in Richards's rectum.  Avalos said no.

Scott Lewis, a criminalist, testified for the prosecution about the sperm cells found on the swab from Richards's rectum, which he had examined microscopically.  Based on the condition of the cells, Lewis opined they likely were deposited no more than six to eight hours before Richards died.  He relied heavily on the fact that some of the cells had intact tails.  Detachment of the tails, he said, happens early in the process of decomposition of sperm cells.  Lewis also said he "read a report" according to which "the persistence of sperm in the rectal cavity is really unexpected after 24 hours."  He opined that sperm cells could last longer in the vagina than in the rectum because the bacteria found in the two organs are different, and those in the rectum cause decomposition to happen more rapidly.

7.

Several prosecution witnesses gave testimony describing Richards as she was while alive. A recurring theme in this testimony was Richards's tidy appearance and dignified air. Sergeant Johnnie Smith of the Madera Police Department had often seen Richards in a long black coat and with a black rolling suitcase. She "seemed very dignified" and "somewhat orderly," "not messy or [unkempt] like you would see with a lot of homeless people." In summer, her clothes were "kind of heavy" for the weather. Officer Jason Valdez also often saw Richards walking in downtown Madera with her suitcase, wearing clothes too warm for the weather. Officer David Herspring, who patrolled downtown on the night shift in the summer of 2000, also saw Richards often and sometimes spoke with her. For him, she "stood out" as unusual among homeless people because he never "noticed that she was under the influence of any drugs or any alcohol." He also found her to be "very neat and clean and organized." Her clothes were neat. "She had a little cart that she used to pull, and inside the cart, everything was organized, very neat." She did not "fit[] the profile" of "typical homeless people" in Madera. Herspring also "believed that she probably had some type of mild mental illness where she could function, but there was something that bothered her, either she didn't like to be in buildings or she didn't like to be around people or she just wasn't very social." Joyce Mensch, an employee of a senior center in Madera, testified that Richards frequently came to the center. She said Richards was "very clean dressed" and "very shy." She "did not like people around her." Richards had a long floral-print skirt she would "wear … all the time, but it was always clean and neat." Whenever Mensch saw Richards sitting at the center or on benches around town, Richards was alone. Mensch "got the impression she didn't like people." Mensch described Richards as "upright," "plain," and "lonely."

Hogan testified in his own defense. He said he lived in Madera at the time of the killing. He did not remember ever seeing Richards or going to the location where she

was killed, and he denied that he committed the crimes. He also said he never forced himself on any woman for sex.

Hogan admitted, however, that for a 10-year period beginning in 1992, when he was 19, and continuing until 2002, he solicited prostitutes in Madera and Fresno about once a month whenever he had no girlfriend. His activities with these prostitutes included anal intercourse. When soliciting prostitutes in Madera, he did so in the downtown area. Sometimes he used a condom, but sometimes he did not. Occasionally, when he went out to solicit a prostitute, he would find a woman who would have sex with him without being paid money—in exchange for a ride, for example. When he paid, the price was from $5 to $15. He had sex with these women in dark areas outdoors or in cars. Hogan said if he had sex with Richards, it was consensual and was part of his practice of having sex with women he solicited on the street in Madera.

Hogan testified the prostitutes he saw in Madera differed from those he saw in Fresno. Those in Madera dressed like "normal folks." In Madera, unlike in Fresno, he could not tell which women were prostitutes by their clothing, so he would look for women who appeared to be loitering or walking with no destination in certain areas, and ask them if they were "working." Sometimes he guessed wrong and got told off. He estimated the ages of the prostitutes he encountered ranged from 20 to 50.

Hogan had a job when he lived in Madera. He worked for a company in Fowler, owned by relatives, that made "industrial-sized Christmas decorations." His work started at 6:00 o'clock in the morning. He used half a gram of methamphetamine once or twice a month in 2000. The drug caused him to stay up late, lose his appetite, and "lose [his] focus on stuff." He denied he ever stayed up all night and went to work in the morning without sleeping. Hogan became addicted to methamphetamine in 2007 and stopped using it after that. He did not believe he was addicted at any other time.

Hogan admitted he had three prior felony convictions: burglary in 1994, taking of a car in 2001, and theft of a generator in 2005. The court had previously ruled that these were admissible for impeachment.

Over defense counsel's objection, the prosecutor was allowed to question Hogan about statements he made to police, following his arrest for the current offenses, regarding incidents of domestic violence in which he had been implicated in the past. When he was arrested, the officers asked him whether he had ever hit a woman. Hogan admitted he said no, and also conceded that, in reality, he had once punched his ex-girlfriend Maria in the face and slapped his ex-wife Teresa. The incidents took place in 1993 and 1994.[3] Maria was treated at a hospital. When asked to explain why he falsely told the officers he had never hit a woman, Hogan said it was a mistake and he misspoke. He thought he was being questioned over a failure to pay child support and "it didn't even occur to me about Maria." Regarding his slapping of Teresa, Hogan said "[t]hat's not a hit to me" and "[t]hat wasn't a big issue." He recalled that, after he slapped Teresa, the police arrived and asked Teresa to leave. Hogan also said when the police were questioning him, they were asking questions rapidly and rudely and he did not have time to think.

The medical expert for the defense was Dr. Marvin Pietruszka, a pathologist. He testified that neutrophils are a type of white blood cells. They are produced in the bone marrow, they circulate in the bloodstream, and their function is to remove infection. It typically takes about six hours for neutrophils to arrive at the site of a wound. Defense counsel asked "what other factors, if any, could delay the neutrophils response beyond the period that you've talked about?" The prosecutor's objection was sustained. Defense

---

[3]Hogan testified that no charges were filed in the incident with Teresa, and the incident with Maria resulted in a misdemeanor conviction under section 243, subdivision (d), battery with serious bodily injury.

counsel asked, "How about environmental factors?  Are there any environmental factors that would slow the response of neutrophils?"  Another objection was sustained.

Defense counsel asked Pietruszka about the rate of deterioration of sperm cells after they have been ejaculated into another person's body.  Pietruszka said they begin to deteriorate within the first hour, but can continue to live and cause pregnancy for at least 24 hours.  They can even be found days later.  Defense counsel then asked, "Now, what would be the difference in the life of the sperm in the rectum as opposed to the vaginal area?"  Pietruszka said, "I don't believe that I've ever read anywhere that that information is necessarily available."  He went on to opine, however, that while in the vagina, sperm cells typically can survive for 24 hours and can remain for days, the time in the rectum might be shorter, though still substantial.  Sperm "may be expelled with fecal matter," but "there's a good probability it may stay there for [awhile] also" and "it would not be surprising that it would stay for 12, 24 hours even."

The prosecutor said, "Objection.  Move to strike.  Basis of knowledge."  The objection was sustained and the motion granted.

Defense counsel questioned Pietruszka about the bruise in Richards's rectum.  He asked whether the bruise *could* have been caused by something other than a penis.  The witness said yes.  Counsel asked whether Pietruszka had an opinion about whether it *was* "caused by a blunt instrument other than a human penis."  The prosecutor objected and was granted leave to voir dire the witness.  During the voir dire, Pietruszka said that during his career, he had examined only one person who had possibly been sodomized; he had seen no irregularities in that case.  He had read studies about injuries to the anus or rectum caused by a penis or a foreign object.  These were about children or young people who had been sodomized; he did not recall whether he had read any similar studies about adults.  After the voir dire, the prosecutor's objection was sustained.

Defense counsel tried a number of other approaches to the same topic, asking Pietruszka whether he had an opinion about the type of force that would damage rectal

11.

tissue, whether it would be painful to a man to inflict a bruise like Richards's bruise with his penis, and whether he had ever seen similar injuries when examining female patients. The prosecutor's objections were sustained each time.

Two witnesses, Kimberlina Ross and Valerie Gupton, testified for the defense about Hogan's background and character. Ross was Hogan's sister. At the time of the murder in 2000, Hogan lived in Ross's apartment in Madera. Also living there were Ross's grandparents, her two children, her ex-husband, and the ex-husband's son. Hogan worked at Crystal Valley Decorating and to get to work each morning he either borrowed the grandfather's car or was picked up by Ross's stepbrother. He left around 5:00 or 6:00 each morning and returned every night to sleep on the couch. The stepbrother lived at Yosemite and "O" Streets in Madera. This was a few blocks from the chiropractor's office at Yosemite and "J" Streets.

Gupton was Hogan's romantic partner from 2006 until his arrest in 2008. They shared an apartment in Oregon. Without objection, defense counsel asked whether their "physical relationship" lasted two years. Gupton said yes. When counsel asked whether the couple "engage[d] in sex," however, the prosecutor's objection was sustained. Gupton said no when asked whether, "given his character," Hogan was capable of committing the charged offenses.

On cross-examination, the prosecutor asked Gupton whether she was aware Hogan had "punched a girlfriend in the face once and broke her nose," "backhanded his ex-wife," and "violently assaulted his eight-year-old son." Gupton had heard these things, and testified she believed Hogan incapable of the current offenses nevertheless. "[T]he violence is different" in the present case, she said.

On redirect, Gupton was asked about her understanding of the prior incidents. She said Hogan was disciplining his son for acting out and the force used was only pushing. She did not know the details of the other incidents. Finally, defense counsel asked Gupton whether Hogan had, during their relationship, a reputation for "being a peaceful

12.

person." Gupton said yes. Later, after Hogan testified, Gupton was recalled by the defense and asked whether Hogan ever struck her. Gupton testified that he had not.

Before Gupton testified, defense counsel made an offer to prove by her testimony "that in various sex episodes between her and Mr. Hogan he never was violent, never forced sex on her." The trial court ruled that this testimony would be inadmissible because Evidence Code section 1102 does not allow character to be proved by specific instances of conduct. After Gupton testified, defense counsel put on the record his contention that he should have been able to ask Gupton whether she and Hogan had sex in order to lay a foundation for questions about Gupton's opinion of whether Hogan was violent in the context of sexual activity. The court reiterated its view that the question was improper because evidence of specific acts was not admissible to show Hogan's nonviolent character.

Defense counsel attempted unsuccessfully to introduce negative character evidence about Richards. The proffered evidence consisted of Richards's criminal history and testimony of a witness who saw some undignified behavior on Richards's part.

The criminal history the defense sought to introduce consisted of a total of three petty thefts that resulted in convictions and jail terms in 1995 and 1997, plus a petty theft charge from 1998 that was unresolved. Defense counsel said he anticipated the prosecution would introduce evidence of Richards's Social Security income to show she did not need to resort to prostitution for money; he argued the history of petty thefts showed she did at times need money badly enough to resort to illegal behavior. The court excluded the history of petty thefts on the ground the offenses were remote and unrelated to prostitution.

The witness, Ernest Folk, testified at an Evidence Code section 402 hearing. Folk testified that, in the summer of 2000, he was in the habit of frequenting Courthouse Park in downtown Madera. He saw Richards there sometimes. Once he saw her sleeping on a

bench. Then, "[s]he gets up. She goes around the tree, pulls her pants down, stoops down and takes a number two. So then she gets up from there, she pulls her pants up, she gets her things, and she takes off from the park." Then she went to the library.

Defense counsel argued this testimony was admissible to rebut the prosecution's evidence that Richards was dignified, shy and reserved, which he anticipated would form the basis of an argument that Richards was not the sort of person who would engage in prostitution or have consensual sex with a stranger. The court said it did not see the relevance of the testimony. It indicated, however, that it might change its view after hearing the prosecution's rebuttal testimony: "Well, if we get to that point where we have a witness talking about character, the Court will—don't go into that area until we've talked further …." The prosecution's character witnesses had already testified during the prosecution's case-in-chief, however, and it did not call any additional witnesses to testify about Richards's character on rebuttal. Defense counsel did not raise the issue again.

On rebuttal, the court accepted a stipulation of the parties to admit a document showing that Richards was receiving Social Security payments.

Officer Valdez was recalled as a rebuttal witness. He said he was familiar with prostitution and prostitutes in downtown Madera in 2000 and the late 1990's. He made prostitution arrests from 1995 to 1998, but was a detective and not working patrol in 2000. The prostitutes he saw downtown while on patrol wore revealing clothing that made it obvious they were prostitutes. He found it hard to believe there were prostitutes in Madera who wore ordinary clothes. When he saw Richards on the streets, it never crossed his mind that she might be a prostitute. He never saw her in the company of the prostitutes on "C" Street where prostitution was focused.

Valdez also testified about his interview with Hogan at the time Hogan was arrested in Oregon. Hogan said he avoided returning to Madera because when he went there, he used methamphetamine and stole things. He said he was using

14.

methamphetamine in 2000 whenever he was out of prison and he committed most of his crimes in Madera County around that time. Hogan did not recognize Richards when Valdez showed him her picture. When asked to explain the presence of his DNA, Hogan said that if he had sex with Richards, she was probably a prostitute he picked up on "C" Street.

Terry Ginder, an investigator with the district attorney's office, testified he reviewed Richards's rap sheet, which was in computerized form in a database known as the California Law Enforcement Telecommunication System (CLETS). It showed no arrests for Richards for prostitution or loitering for the purpose of prostitution. On cross-examination, Ginder testified that CLETS would not show a prostitution arrest for Richards if she had given a false name and would not have any record of instances in which Richards might have been cited but not booked. After Ginder testified, defense counsel placed on the record his argument that he should have been allowed to question Ginder about the remainder of Richards's rap sheet—i.e., the three petty theft convictions and one unresolved petty theft arrest. The court said it "just didn't see the connection or the probative value, just seemed to be outweighed by the consumption of time."

The prosecution called as a rebuttal witness Hogan's ex-wife, Teresa Williams. She testified that in 1992, during the first week of their marriage, Hogan disappeared for about two weeks, saying he was going to see his mother. He returned unannounced and found her talking on the phone with her mother. This angered him. He grabbed the phone from her and "smacked [her] across the face" with the back of his hand. Then he dragged her across the floor by her feet. She kicked him until he let go. This took place in the presence of their children. Hogan left and she called the police, who came and photographed her injuries. The officers did not tell Williams to leave. Instead, they told her to call them if Hogan returned. Williams did leave, however.

Finally, the prosecution called Johnny Upshaw, a criminalist with the state Department of Justice. When the prosecution was preparing its case, Upshaw was asked

15.

to analyze a pair of underwear that had been in storage since Richards's body was found. The prosecution gained admission of this testimony by arguing that if Hogan had consensual sex with Richards and she was attacked and murdered by someone else afterward, she would have put her underwear back on after having sex with Hogan, and his seminal fluid likely would have leaked onto the underwear, so the presence or absence of evidence of this would be relevant. Upshaw testified that he tested the underwear for an enzyme known as AP and a protein known as p30. AP and p30 are found in several different bodily fluids, including seminal fluid. The samples were negative for AP and showed a small amount of p30. Upshaw also examined samples of the underwear microscopically for sperm cells. Heads of sperm cells tend to last longer than p30, but Upshaw found none. Upshaw concluded he could neither confirm nor exclude the presence of semen in the underwear. Four nickel- to quarter-sized brown spots on the underwear were proved to be blood.

In her closing argument, the prosecutor said common sense supported the view that Hogan was lying when he claimed Richards must have been a prostitute with whom he had consensual sex before she was attacked and killed by someone else. According to both medical experts, neutrophils would have arrived within six hours had Richards still be alive for that long after the bruise was inflicted. Yet Richards was seen sleeping at 10:00 p.m. and 4:00 a.m. and was killed before 8:00 a.m. If Hogan's story were true (and assuming it was he who inflicted the bruise), Richards must have awoken some time after 10:00 p.m., met Hogan and had sex with him, gone back to sleep in the doorway, and then been attacked. But this was unlikely. Further, there should have been no sperm cells with tails still attached if Hogan had sex with Richards more than six to eight hours before her death. And if he did, sperm should have been found on the underwear. The only reasonable inference was that the DNA was deposited at the time of the murder and belonged to the murderer.

16.

The prosecutor argued that the bruise in Richards's rectum was caused not by a foreign object but by Hogan's penis repeatedly hitting the same spot. She contended that it repeatedly hit the same spot because Richards's body was awkwardly positioned in a narrow space at the side of the building, and Hogan could not "get a good angle." The fluid found on the ground between Richards's legs was probably a lubricant used for the anal sex. There would have been no need for a lubricant if the injury was inflicted with a foreign object.

The prosecutor further maintained it was not believable that Richards was a prostitute who did not dress like one. The evidence about her appearance, habits, and income was inconsistent with the notion she was a prostitute, and Madera prostitutes look the same as prostitutes elsewhere. Richards avoided people and was "never undignified," and Hogan was a violent methamphetamine user.

Defense counsel argued the evidence gave rise to a reasonable doubt in several ways. First, even though the evidence of Hogan's character included evidence of domestic violence, it was not compatible with the sexual sadism with which the murder apparently was committed. Gupton thought Hogan could not have done it, even though she knew of the domestic violence. Next, a homeless woman with possible mental health issues might agree to have sex for money even if she did not look like a prostitute and even if she was getting a Social Security check. The bruised rectum was more likely caused by a blunt instrument than by a penis. If Hogan did cause the bruise by means of consensual sex and he had sex with Richards shortly before the neighbor saw Richards in the doorway around 10:00 p.m., and Richards was killed shortly after 4:00 a.m. when the neighbor saw her in the doorway again, the absence of neutrophils from the bruise site would be consistent with the outer time limit of six hours for neutrophil response. This scenario was similarly consistent with the eight-hour time limit for sperm cell persistence testified to by Lewis. Further, the absence of neutrophils was consistent with the theory

17.

that the bruise was caused not by the earlier consensual sex with Hogan at all, but by a later sexual assault by another person with a foreign object.

The jury found Hogan guilty of first degree murder and guilty of forcible sodomy. The special-circumstance and enhancement allegations were found true. The court sentenced Hogan to life in prison without the possibility of parole on count 1. The sentence on count 2 was stayed pursuant to section 654.

## *DISCUSSION*

As we explain in parts I and II below, we agree with Hogan about several of the errors he asserts. We will discuss the prejudicial effect of all the errors collectively in part III.

### I.   *Evidentiary rulings*

Hogan challenges several of the court's evidentiary rulings. We review the trial court's decision to admit or exclude evidence for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196; *Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 135.) A court abuses its discretion if its decision exceeds the bounds of reason, is unsupported by substantial evidence, or applies the wrong legal standard. (*Conservatorship of Scharles* (1991) 233 Cal.App.3d 1334, 1340.)

#### A.   *Absence of neutrophils*

Hogan maintains the trial court erred when it prohibited him from cross-examining the prosecution's medical expert, Dr. Avalos, on the topic of neutropenia, malnutrition, and other conditions that could provide an alternative explanation for the lack of neutrophils at the site of the bruise in Richards's rectum. He says it also was error when the trial court sustained the prosecutor's objection to the same questions when asked of the defense medical expert, Dr. Pietruszka. We agree.

While discussing defense counsel's attempt to cross-examine Avalos on this topic, the court stated the testimony called for by counsel's questions would be irrelevant unless counsel could first lay a foundation by showing that Richards had neutropenia,

malnutrition, or another condition that would account for the lack of neutrophils at the injury site. Relevance was again the stated ground when the court sustained the prosecutor's objection to a neutropenia question shortly after this discussion. The prosecutor stated no grounds when objecting to the same line of questioning during the direct examination of Pietruszka, but we assume the court sustained the objections for the same reason.

The court was mistaken. Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Even if there was no evidence to show Richards had neutropenia or the like, facts about such conditions occurring in the general population would still have shown there was a chance that shortness of time was not why the bruise lacked neutrophils.

Insufficient time for neutrophils to arrive was one of the hypotheses the prosecution relied on in arguing the semen was deposited close in time to the murder and therefore likely belonged to the murderer. Therefore, it was a disputed fact of consequence to the determination of the action. Testimony about neutropenia and other conditions causing a dearth of neutrophils would have had some tendency in reason to show insufficient time was not the cause. The court could not, within the bounds of reason, find this testimony irrelevant.

The People do not attempt to show the trial court was correct in ruling that the testimony defense counsel sought to elicit was irrelevant. They offer an array of alternative grounds for affirmance. None are persuasive.

First, the People argue we should disregard Hogan's arguments on this point because his opening brief does not mention the abuse-of-discretion standard for appellate review of an asserted state-law error in the exclusion of evidence. The People are correct that we could exercise our discretion to discount Hogan's argument for this reason (see *People v. Foss* (2007) 155 Cal.App.4th 113, 125-126), but to do so in this instance would

19.

elevate form over substance. We review evidentiary rulings very routinely and the standard of review is exceedingly familiar to us. Hogan's failure to recite it in his brief's section on this issue has caused us no difficulty. (In other sections claiming error in exclusion and admission of evidence, he does frame his argument in terms of abuse of discretion.) The rote recitation of the standard in the People's brief shows that Hogan's omission of it also has resulted in no surprise or unfairness to the People. They are as well aware of it as we are.

The People next argue the rulings were supported by Evidence Code section 352 (evidence inadmissible if its probative value is substantially outweighed by its prejudicial effect), so we should affirm them on that ground even though the court did not rely on it. The People's argument here is based on the notion that questioning on the excluded topic "would have been speculative and could have led to a confusion of the issues." We do not see how. The role of the neutrophil evidence in the People's case was to show that, if Richards had a normal supply of neutrophils in her blood, neutrophils should have been present at the bruise site if the bruise was more than a few hours old at the time of death. The role of the evidence Hogan attempted to introduce would have been to point out that this would not be so if Richards did not have a normal supply of neutrophils. Whether she had a normal supply was a point about which neither side had any evidence. The evidence Hogan sought to introduce therefore was no more "speculative" than the evidence the People did introduce, and it would have clarified the issue, not confused it.

The People also rely on a distinction Avalos made between the production of neutrophils by the bone marrow and the response of neutrophils to an injury site. In response to defense counsel's question referring to causes of a "lack of neutrophil response," Avalos said there were conditions that can cause a lack of neutrophils in the body, but "I don't know about a lack of neutrophil response." The People say this distinction somehow shows that Avalos's testimony was not based on an assumption that Richards had a normal level of neutrophils in her blood. It is clear, however, that

20.

Avalos's testimony had a point only if Richards was assumed to have a normal level of neutrophils and that the prosecutor's reliance on the testimony presupposed this. If she did not have a normal level, the lack of neutrophils at the bruise site would have had no meaning. The distinction Avalos made between neutrophil production and response has no bearing on this point. The only reasons for a lack of neutrophil response that ever were at issue in the case were lack of time and lack of neutrophils.

Finally, the People contend the trial court did not abuse its discretion because Hogan never made an adequate offer of proof. They rely on Evidence Code section 354, subdivision (a) (reversal of judgment based on erroneous evidentiary ruling inappropriate unless the "substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means").

Defense counsel proceeded in a manner consistent with Evidence Code section 354. Regarding the cross-examination of Avalos, it is clear from the discussion between the court and counsel that the court understood the point of counsel's questions. The discussion and the ruling were premised on an understanding that counsel wanted to elicit an admission that neutropenia and malnutrition were possible causes of the lack of neutrophils at the bruise site. In any case, an offer of proof was made unnecessary by subdivision (c) of Evidence Code section 354, which states that no such offer is required if "[t]he evidence was sought by questions asked during cross-examination or recross-examination." The People assert this provision did not apply because the questions were outside the scope of the direct examination, but this is not so. The scope of the direct examination included medical explanations of the lack of neutrophils at the bruise site.

Regarding the direct examination of Pietruszka, there was no need for an offer of proof because "[t]he rulings of the court made compliance with subdivision (a) futile …." (Evid. Code, § 354, subd. (b).) The court had already ruled that evidence of neutropenia and other medical conditions causing a lack of neutrophils was irrelevant unless the defense showed Richards had one of those conditions.

21.

For all these reasons, we conclude the trial court abused its discretion when it barred defense counsel from questioning Avalos and Pietruszka about neutropenia and other conditions that could have caused a lack of neutrophils at the bruise site.

### B.       *Persistence of sperm cells*

Hogan argues the trial court erred when it sustained the prosecutor's objection and granted her motion to strike after Pietruszka testified that intact sperm cells could remain in the rectum for as long as 12 to 24 hours. We agree.

The objection the court sustained was "[b]asis of knowledge." A bench conference was held immediately afterward, but no discussion of what was said was ever placed on the record. Just before the objection, Pietruszka testified that sperm can survive in the *vagina* and can cause pregnancy for at least 24 hours and have been found to survive for days. He said he had not "ever read anywhere" about the difference, if any, between sperm survival rates in the rectum versus in the vagina. He went on to offer his opinion that survival after 12 to 24 hours would not be surprising; then the objection and motion to strike were made. Lewis, the criminalist testifying for the prosecution, had previously given his opinion that the intact sperm cells he found would not have been there if they had been deposited more than six to eight hours before Richards died. He had read a report saying persistence of sperm in the rectum is unexpected after 24 hours; and he opined that sperm cells would last longer in the vagina than in the rectum.

The court abused its discretion in ruling that Pietruszka had no adequate basis for his opinion. An expert witness's testimony is required to be "[b]ased on matter (including his special knowledge, skill, experience, training, and education)" that is "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates …." (Evid. Code, § 801, subd. (b).) Pietruszka testified he had been a physician for 35 years and was a board-certified pathologist. His training included clinical pathology, anatomic pathology, and immunopathology. He had taught forensic pathology at the University of Southern California Medical School. He

22.

had "examined thousands of women over the years in a clinical setting." He had experience examining sperm cells microscopically and was allowed, over objection, to testify about the persistence of sperm cells in the vagina. We perceive no reason why Pietruszka's knowledge, experience, training, and education would be insufficient to support the opinion he gave about the persistence of sperm cells in the rectum. It appears to us the criminalist Lewis was qualified to give his opinion on the same topic, and his experience, training, and education were far inferior to Pietruszka's. Lewis had a bachelor's degree in chemistry, some additional biology classes necessary for DNA analysis, an "introduction to forensic science" class, and a student internship at a crime lab. He had worked for the state as a criminalist and a supervisor for 15 years.

The People suggest that Pietruszka's experience and training were inadequate because "counsel never … sought to have [him] recognized as an expert in the area of the survival rate of sperm in the rectum." An expert witness is qualified, however, if he or she "has sufficient skill or experience in the field so that his testimony would be likely to assist the jury .…" (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 38.) We agree with the remark in Hogan's brief that "[t]he survival rate of sperm in the rectum is not a 'field.'" It is only one of countless topics on which a pathologist is potentially qualified to testify. As we have said, we see no reason why Pietruszka's extensive experience as a pathologist would not qualify him to testify about it in this case.

Next, the People state Pietruszka "is not a forensic pathologist." The reality is that Pietruszka testified, "I am a forensic pathologist." He went on to explain that he had long practiced forensic pathology, which involves the determination of causes of death, but had never taken the examination necessary to obtain board certification in forensic pathology. The certification is not necessary to practice, he stated. Pietruszka's lack of board certification in forensic pathology did not disqualify him from testifying about the survival rate of sperm cells in the rectum.

23.

The People also argue Pietruszka "did not provide a reasonable basis for his opinion" because he said he had not read any studies on the specific topic of the comparative longevity of sperm cells in the rectum and vagina, and because he said he did not know "exactly" how long sperm would last in the rectum and admitted his opinion was about "probability," not certainty. The People's argument implies that an expert opinion must be based on studies rather than on the expert's experience and training, must always employ exact figures, and must state that the matter in question is certain to a probability of 100 percent. There is, of course, no authority for these propositions.

Last, the People argue defense counsel failed to comply with Evidence Code section 354 because he did not proffer the testimony Pietruszka would give. In this instance, however, the proffered evidence was "made known to the court" by "other means" (Evid. Code, § 354, subd. (a)): The witness answered the question. The court surely heard the answer, for it ordered it stricken.

We conclude the court abused its discretion when it excluded Pietruszka's opinion about the persistence of sperm cells in the rectum.

### C. Cause of the bruise

Hogan maintains the trial court should have allowed his expert to give his opinion of whether or not the bruise in Richards's rectum was caused by a penis. We agree. As with the ruling on Pietruszka's opinion about the persistence of sperm cells, the ruling here was based on the trial court's view that the witness had no adequate basis for his opinion. The record cannot reasonably be seen as supporting that view.

Defense counsel asked Pietruszka whether the injury to the rectum *could* have been caused by something other than a penis, and Pietruszka said yes. When counsel then asked whether, in the witness's opinion, it *was* caused by something other than a penis, the prosecution objected and asked to voir dire the witness, leading to the following exchange:

"Q     Have you done any autopsies or studies of people that you knew had been forcibly sodomized, either with a foreign object or a penis, and I'm asking for a yes or no answer?

"A     No.

"Q     Okay.  So you've done no exams of people who have been sodomized?

"A     It is possible that the one case that I can recall was sodomized.  But I—I don't recall seeing any abnormalities or—and she was comatose at the time, so she didn't know.

"Q     Have you read any studies about injuries caused to someone's anus or rectum by a penis or a foreign object?

"A     Yes.

"Q     And tell me about those studies, please.

"A     Most of the cases that I've read deal with children that have been sodomized.

"Q     Have you done—read anything about adults?

"A     I don't recall, because most of the cases that we see are in younger people and children.

"Q     So if you have read it, you don't recall it?

"A     I don't recall that I read about adults being sodomized, but I do recall reading about children.  And younger people."

After a discussion off the record, the court then sustained the objection.  Defense counsel made efforts to reframe the question, but the prosecutor's objections were again sustained.  Later, a discussion was held outside the presence of the jury about why the testimony was excluded:

"[The prosecutor]:  Your Honor, I think the witness testified quite clearly that he had no experience with forcible sodomy, either penile [or] foreign object.  And he had read [no] studies with regard to that.  And based on that, I didn't see any basis for him to have an opinion that would be relevant for the jurors in this matter.

25.

"THE COURT: And further, I believe, he indicated he hadn't examined anyone with such injuries previously either; alive or deceased, is my recollection. So the Court was concerned about him testifying about an area that he did not appear to have any training or experience in, that's why the Court precluded him from testifying about that."

Once again, the proper inquiry is not whether the witness had previously encountered precisely the same facts as those presented by this case. It is whether his opinion is "[b]ased on matter (including his special knowledge, skill, experience, training, and education)" that is "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates …." (Evid. Code, § 801, subd. (b).) Pietruszka was an experienced pathologist and professor of pathology, and he had examined thousands of patients. He was not precluded from giving an opinion about the cause of the bruise by the facts that he had not seen the same type of injury in a person's rectum before or that the relevant studies he had read were about people younger than Richards.

Some of the questions defense counsel asked after the ruling illustrated ways in which Pietruszka's expertise could support an opinion that would have been helpful to the jury. For instance, he was asked whether he had an opinion about the type of force that would be necessary to inflict damage on rectal tissue. Objections to all these questions were sustained. Similarly, defense counsel argued to the court that, from the studies Pietruszka had read about children and younger people who had been sodomized, Pietruszka could "extrapolate" to form an opinion about injuries to an adult.

Remarks made by Pietruszka during an Evidence Code section 402 hearing preceding his testimony to the jury give additional support to the conclusion that Pietruszka had adequate experience and training in the field. He had not examined the rectal tissue of any unconscious or deceased people who had been sodomized, but he was well acquainted with the rectum and injuries to it in spite of this:

"And my experience is actually in a clinical setting, examining people who either suspected they were raped or not sure if they were raped. Or in the

26.

course of usual examinations of thousands of women, I have seen abrasions in the rectum, sure. I don't know what the cause of that abrasion was, necessarily. Does not necessarily mean that the individual had anal intercourse; could come from other—other reasons. Rectal fissures are very common. They are frequently related to hemorrhoids and other, rectal pathology. So that's my experience. I, obviously, I have not seen rapes—rape cases like this every day. But the physiology and the pathology is—is something that we've studied and it's not rare."

The court abused its discretion by holding, in effect, that an expert cannot testify about matter within his field unless he has seen or read about facts closely matching those at issue in the case. Defense counsel was correct when he argued to the court that the prosecutor's arguments about the exact nature of Pietruszka's clinical experience and reading had a bearing only on "the weight given to [Pietruszka's] testimony [and not] the admissibility of that testimony."

In addition to arguing that the court reasonably found Pietruszka lacked an adequate basis for his opinion, the People fault defense counsel for not "qualif[ying] Dr. Pietruszka as an expert to offer an opinion on the mechanism of the rectal injuries in adults or [laying] a foundation to show how Dr. Pietruszka's experience with child sexual abuse victims bore any relevance to the injuries suffered by the adult, female victim." As we have said, however, an expert's qualifications are determined by his or her experience and training in the *field* relevant to the subject of the testimony. The "mechanism of the rectal injuries" is not a field. Pietruszka's expertise in his field qualified him to testify on this topic.

### D.    *Richards's character*

Hogan contends the court abused its discretion when it excluded evidence proffered to rebut the prosecution's evidence of Richards's character. Again, we agree.

The evidence consisted of Richards's criminal history of three petty theft convictions, plus the testimony of Ernest Folk about the incident in which Richards defecated in Courthouse Park. The court excluded Folk's testimony as irrelevant. It excluded the criminal history on the ground that the offenses were remote and unrelated

to prostitution and any probative value would be "outweighed by the consumption of time."

The evidence was admissible under Evidence Code section 1103, which allows a criminal defendant to introduce evidence of the victim's character, including evidence of specific acts, "to prove conduct of the victim in conformity with" the character trait. The People do not argue the evidence was inadmissible because it was character evidence.

Contrary to the view of the trial court and the views expressed by the People on appeal, the evidence of Richards's character was not irrelevant and could not properly be excluded under Evidence Code section 352. It was not irrelevant because it had some "tendency in reason" (Evid. Code, § 210) to undermine the prosecution's reasons for claiming Richards would never have engaged in prostitution or sex with a stranger, and it was not excludable under Evidence Code section 352 because its prejudicial effect was insignificant relative to its probative value.

The prosecutor argued to the jury that Hogan's defense must have been a lie because, among other reasons, it was unreasonable and contrary to common sense to believe Richards could have been a prostitute or had sex with a stranger. The prosecutor commented that Richards's personal dignity and financial means were some of the factors that made this incredible. The evidence that she committed petty property crimes and defecated openly in view of others thus had some relevance to the People's line of argument. It is true the proffered evidence did not show that Richards was a prostitute, but it was relevant to the reasons the People gave the jury for finding it incredible that she could have been one. The probative value of the evidence, therefore, was significant. The potential prejudicial effect was small. The jury was not at all likely to misuse the evidence by, for instance, deciding not to take Richards's murder seriously just because some of her behavior was indecorous or illegal. The court's view that there would be undue consumption of time was unfounded. The time required to introduce Folk's brief testimony and the records of the theft offenses would have been trivial.

Hogan also argues that the theft offenses were admissible under Evidence Code section 356 because they were part of the same rap sheet the prosecution used to establish that Richards had never been arrested for prostitution. Evidence Code section 356 provides: "Where part of [a] … writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party .…" Given our holding, it is unnecessary to address this contention.

Finally, the People argue that Hogan did not preserve the issue of the admissibility of Folk's testimony because Hogan did not renew his proffer after the prosecution completed its rebuttal case. The court had indicated it would reconsider the issue if there were additional character witnesses whose testimony made Folk's testimony relevant. As we have mentioned, however, there were no such additional witnesses, and the witnesses whose character testimony made Folk's testimony relevant had already testified. Raising the issue again, therefore, would have been futile. The court had already made its view clear, and nothing had changed.

### E.    Hogan's character

Hogan attempted to show by the testimony of Gupton, his girlfriend, that he did not have a character trait of violence in the context of sexual activity. Defense counsel sought to ask Gupton first whether she and Hogan had had sex; then he would have asked if Hogan had ever been violent in a sexual situation; and finally he would have elicited Gupton's opinion of whether Hogan had a sexually violent character. The court blocked this line of inquiry by barring the foundational questions (whether Gupton and Hogan had had sex and whether he was ever violent while they were having sex). Hogan argues that this ruling was an abuse of discretion. We agree.

The court explained that it excluded the testimony because it would involve the use of specific instances of conduct to show character. The court cited Evidence Code section 1102, which allows character evidence "in the form of an opinion" or evidence "of [the defendant's] reputation," but does not mention evidence in the form of specific

29.

instances of conduct. The Law Revision Commission comment to the statute states that it "codifies the general rule under existing law which precludes evidence of specific acts of the defendant to prove character as circumstantial evidence of his innocence …." (Cal. Law Revision Com. com., 29B pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1102, p. 312.)

The court misapplied the rule against using specific instances of conduct to prove character. In asking whether Gupton and Hogan had sex, defense counsel was not aiming to use a specific instance of sex between them to establish that Hogan had a character for having sex. He asked this to establish Gupton's personal knowledge of Hogan's sexual behavior, a foundational question to support her admissible opinion that Hogan had no character trait of sexual violence. Counsel also did not seek to ask about any specific instance of sex between Hogan and Gupton in which Hogan did not behave violently. He sought to ask whether Hogan *ever* behaved violently during sex. The purpose of this question would again have been to elicit a foundation for Gupton's admissible opinion that Hogan did not have a sexually violent character.

The trial court reasoned that asking whether Hogan ever engaged in certain behavior was equivalent to asking, in a series of questions, about specific instances of his behavior on each day of the calendar: "I think the fact that on a specific day—and you could go day by day—that he didn't commit an act of violence, I don't think that's probative of anything." The court thought this meant any did-he-ever type of question would contravene Evidence Code section 1102.

Our Supreme Court rejected the same reasoning in *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*). There, the trial court excluded certain testimony by witnesses who had long observed the defendant's behavior with their young daughters. In order to support their opinions that the defendant did not have a character trait of engaging in lewd conduct with children, the witnesses would have said the defendant never engaged in inappropriate behavior with their children. (*Id.* at p. 1309.) The Supreme Court held

that this testimony would not have violated the rule against admitting evidence of specific instances of conduct to show a criminal defendant's good character:

> "A fair reading of the offer of proof shows that the women witnesses would not have limited their testimony to specific instances in which defendant had the opportunity to, but did not, molest their daughters. Instead, the witnesses proposed to testify that they observed defendant's behavior with their children throughout the course of their relationship with him, and their opinion that he is not a person given to lewd conduct with children arose from that experience as a whole. Thus viewed, the proffered testimony was intended to prove the relevant character trait not by specific acts of 'nonmolestation,' but by the witnesses' opinion of that trait based on their long-term observation of defendant's course of consistently normal behavior with their children. The court should have allowed such testimony." (*McAlpin, supra*, 53 Cal.3d at pp. 1309-1310, fns. omitted.)

In a footnote, the Supreme Court added: "The proffered testimony is thus distinguishable from the hypothetical suggested by the trial court, viz., 'it's like saying, well, this defendant is charged with robbing a bank and I have a witness who saw him walk past a bank a week before without robbing it.'" (*McAlpin, supra*, 53 Cal.3d at p. 1309, fn. 14.)

The ruling in the present case is precisely analogous to the one found erroneous in *McAlpin*. Just as it was error to exclude testimony that the witnesses in *McAlpin* never saw the defendant behave inappropriately with children, it was error here to exclude Gupton's testimony that Hogan never engaged in sexual violence during their sexual activities.

The People's brief claims that "the trial court's rulings prior to Gupton's testimony were in accord with" *McAlpin*. The brief does not attempt to justify this claim, however, and it is incorrect for the reasons we have given. The People also attempt to distinguish *McAlpin* by arguing there was no prejudice in this case because Hogan's counsel was allowed to ask whether Hogan and Gupton had a "physical relationship" and whether Gupton believed Hogan capable of committing the crimes. Prejudice is a separate issue

31.

from the issue of whether the ruling was erroneous, however. Our discussion of prejudice is in part III below.

### F. *Admission of Hogan's prior false statement*

Hogan argues the court abused its discretion when it admitted evidence of his false statement to the police that he had never hit a woman. We agree. The court admitted this evidence primarily because it believed it was relevant to show consciousness of guilt. Secondarily, the court said the evidence impeached Hogan's credibility. Under the circumstances, neither rationale can support the ruling.

During a discussion outside the presence of the jury, the prosecutor argued the evidence was admissible to impeach Hogan's credibility. Defense counsel argued the evidence should be excluded under Evidence Code section 352 because "the impeachment was not very probative," yet it was "very prejudicial," as it not only revealed his false statement but also focused attention on the fact of his violent behavior.[4] The court agreed with the prosecutor that the evidence served the purpose of "testing [Hogan's] credibility," but it emphasized a different ground of admissibility, one it had come up with on its own: The jury could find that the evidence "reflect[ed] the consciousness of guilt." The court indicated it would formulate a jury instruction on consciousness of guilt. The next day, it told the jury that, "[i]f the defendant made a false statement or misleading statement before this trial relating to the charged crime, knowing the statement was false or intended to mislead, that conduct may show he was aware of his guilt and the crime, and you may consider it in determining his guilt." A similar instruction, CALCRIM No. 362, was given at the conclusion of the trial.

The Court of Appeal rejected a consciousness-of-guilt theory of admissibility in similar circumstances in *People v. Fritz* (2007) 153 Cal.App.4th 949 (*Fritz*). Fritz was

---

[4]The jury had already been exposed to the prior incidents of domestic violence in the context of the prosecutor asking Gupton whether hearing of them affected her opinion of Hogan's capacity for violent acts.

charged with shoplifting from a department store. When he was arrested, he told the police he had never stolen anything from a store before. This was false; Fritz had prior shoplifting convictions. The trial court granted the prosecutor's request to introduce evidence of the false statement and then to demonstrate its falsehood with evidence of one of Fritz's prior convictions. (*Id.* at pp. 954-955.) The trial court believed "the statement, when demonstrated to be false, was admissible as evidence of Fritz's consciousness of guilt." (*Id.* at p. 955.) On appeal, the People argued this was correct, explaining that Fritz's decision to lie about his criminal history tended to show he was trying to evade detection of his guilt of the current offense. (*Id.* at p. 957.) The Court of Appeal wrote:

> "We are not persuaded.… [T]he cases allowing 'consciousness of guilt' evidence have done so only in circumstances where the defendant's lie related directly to the crime charged—for example, a false alibi, a questionable story about how defendant came to innocently possess stolen goods, or a denial of any relationship to the victim. [¶] Way back in *People v. Cole* (1903) 141 Cal. 88, 90 … our Supreme Court explained the rule this way: 'Deception, falsehood, and fabrication *as to the facts of the case* are treated as tending to show consciousness of guilt, and are admissible on the same theory as flight and concealment of the person when charged with crime.' (Italics added.) In *People v. Wayne* (1953) 41 Cal.2d 814, 823 … [and] in *People v. Kimble* (1988) 44 Cal.3d 480, 496 …, [the Supreme Court reiterated this view]." (*Fritz, supra*, 153 Cal.App.4th at pp. 957-958.)

The court concluded: "Unless the lie implies an admission of guilt or is otherwise relevant in ascertaining the defendant's involvement in the crime at issue, it should be excluded." (*Fritz, supra*, 153 Cal.App.4th at p. 958.)

Hogan's false statement about his history of domestic violence did not imply an admission of guilt of the current offenses or indicate anything about his involvement in the current offenses. The People suggest the false statement supported a reasonable inference that, by representing himself as nonviolent, Hogan was trying to deflect suspicion from himself for the current offenses. Their notion appears to be that Hogan

33.

was thinking he could discourage the idea that he would be involved in Richards's murder if he concealed the prior incidents. But a similar notion is part of what the Court of Appeal rejected in *Fritz*. As we mentioned, the People's view in *Fritz*—which the court found to be incorrect—was that Fritz was trying to discourage suspicion that he was involved in the current shoplifting by concealing his prior shoplifting. (*Fritz, supra*, 153 Cal.App.4th at p. 957.)

The People attempt to distinguish *Fritz* by pointing out that, unlike Fritz, Hogan testified at trial, thereby exposing himself to impeachment by evidence of a character trait of untruthfulness. The *Fritz* court emphasized the fact that Fritz did not testify. (*Fritz, supra*, 153 Cal.App.4th at pp. 955-956.) As we will now explain, the admission of the prior false statement in this case also cannot be upheld on the ground that it impeached Hogan's trial testimony.

Hogan argues that, because the evidence impeached his truthfulness on a collateral matter (the prior incidents of violence), the court was required to analyze the probative value of the evidence relative to its prejudicial effect under Evidence Code section 352 and was obliged to indicate on the record it had done this. He says the record contains no such indication. We agree with this contention.

Impeachment of a witness's credibility is carried out either by means of matter that is relevant to an issue in the case or by means of collateral matter. If the impeaching evidence is not collateral, its admissibility is unproblematic. "Proof that a witness was in error in some statement tends to show that the witness is untrustworthy. [Citation.] And where the statement concerns a matter that is relevant and therefore could be proved or disproved independently of the impeachment, admissibility of contradictory evidence or of prior inconsistent statements is unquestioned." (3 Witkin, Cal. Evid. (5th ed. 2012) Presentation at Trial, § 352, p. 496.) By contrast, the admission of impeachment evidence on a collateral matter is committed to the trial judge's discretion, subject to an

evaluation pursuant to Evidence Code section 352 of its probative value and prejudicial effect.  (3 Witkin, *supra*, § 353, at pp. 496-497.)

Hogan says his false statement to the police about the prior incidents is a collateral matter because, while it may be probative of his character for honesty or dishonesty (see Evid. Code, § 780, subd. (e)), it is not directly relevant to the facts in this case. Consequently, an Evidence Code section 352 analysis was required.  The People do not claim otherwise.

When an evidentiary ruling involves a weighing of probative value and prejudicial effect under Evidence Code section 352, the ruling can be upheld as a proper exercise of the trial court's discretion only if there is some indication in the record that this weighing was actually carried out.  When a trial court applies Evidence Code section 352, "the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value .…"  (*People v. Green* (1980) 27 Cal.3d 1, 25, overruled on other grounds by *People v. Martinez* (1999) 20 Cal.4th 225, 239.)  There is, however, no requirement that the record contain either express weighing or an express statement that weighing has been done.  (*People v. Williams, supra,* 16 Cal.4th at p. 214.)  "[T]he necessary showing can be inferred from the record despite the absence of an express statement by the trial court."  (*People v. Prince* (2007) 40 Cal.4th 1179, 1237.)  "All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352."  (*Williams, supra*, at p. 214.)

There is no indication in the record that the court believed an Evidence Code section 352 analysis was necessary before the false-statement evidence could be admitted.  The sole indication that it was relying on impeachment as a ground of admissibility was its remark that the evidence was relevant to credibility.  The court's focus was on consciousness of guilt as a theory of admissibility.  In connection with the false-statement evidence, the court never referred to probative value or prejudicial effect using those terms or any others.

The People assert that the court's comments "show that the court weighed the probative value against the prejudicial effect and possibility the evidence might result in undue consumption of time, thereby complying with its obligation under [Evidence Code] section 352."  The record citation the People provide, however (pp. 3407-3409 of vol. 12 of the reporter's transcript), does not support this assertion.  The court referred to probative value and consumption of time on page 3407, but it was talking about a different issue (the admissibility of Richards's petty thefts).  Defense counsel contended "the impeachment was not very probative and very prejudicial," but the court did not make any remark on that topic.

For these reasons, we conclude the admission of the false-statement evidence cannot be upheld as a valid exercise of the court's discretion to allow impeachment on a collateral matter.

## II.     Jury instructions

### A.     CALCRIM No. 362

Hogan argues the trial court erred when it instructed the jury on consciousness of guilt pursuant to CALCRIM No. 362.  As we have explained, the evidence to which this instruction referred was not admissible to show consciousness of guilt, so we agree that giving the instruction was erroneous.

Whether or not to give a particular jury instruction is a mixed question of law and fact that we review de novo.  (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)  Where the instruction states that the jury is permitted to make an inference, it is error to give the instruction unless the record contains evidence that would support the inference.  (*People v. Hart* (1999) 20 Cal.4th 546, 620.)

CALCRIM No. 362, as given to the jury in this case over Hogan's objection, stated:

> "If the defendant made a false or misleading statement before this trial
> relating to the charged crime, knowing the statement was false or intending

to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance; however, evidence that the defendant made such a statement cannot prove guilt by itself."

This instruction told the jury it could infer an awareness of guilt if it found Hogan made a false statement relating to the charged crime. For the reasons discussed above, the evidence of Hogan's false statement related to his prior violent acts, not the current offenses, so it was not admissible to prove consciousness of guilt. Therefore, the evidence could not support the type of inference to which the instruction refers. It was error to give the instruction.

## B.    CALCRIM No. 361

Hogan's final contention is that the court erred in instructing the jury in accordance with CALCRIM No. 361, pertaining to a failure to explain or deny evidence against him. We think the instruction was correctly given.

The instruction, given over Hogan's objection, stated:

"If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

CALCRIM No. 361 allows the jury to make an adverse inference from a defendant's nonexplanation of evidence. As with CALCRIM No. 362, the question is whether the record contains evidence (in this instance, evidence of a failure to explain something) that would support the inference.

In *People v. Belmontes* (1988) 45 Cal.3d 744 (*Belmontes*), overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22, our Supreme Court discussed the application of CALJIC No. 2.62, a predecessor of CALCRIM No. 361 expressing the same substance. The court stated: "'[I]f the defendant tenders an

37.

explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible, the inquiry whether he reasonably should have known about circumstances claimed to be outside his knowledge is a credibility question for resolution by the jury [citations].' [Citation.]" (*Belmontes, supra*, at p. 784.)

The People argue that CALCRIM No. 361 was applicable because Hogan did not sufficiently explain the presence of sperm cells containing his DNA in Richards's rectum. Hogan argues he did give an explanation, namely his statement that he did not remember having sex with Richards, but he was regularly having sex with prostitutes in downtown Madera at the time.

Under the Supreme Court's reasoning in *Belmontes*, Hogan's testimony included evidence sufficient to support the instruction. According to that case, part of the inquiry for this type of instruction is whether the defendant's explanation of the evidence is "'implausible.'" (*Belmontes, supra*, 45 Cal.3d at p. 784.) Under all the circumstances, the jury could reasonably find Hogan's explanation of the presence of his sperm in Richards's body to be implausible. The next question under *Belmontes* is "'whether [the defendant] reasonably should have known about circumstances claimed to be outside his knowledge ….'" (*Ibid.*) Hogan offered a theory to explain the presence of his sperm in Richards's body, but he also claimed he did not know since he had no memory of her. Whether he reasonably should have known, therefore, was "'a credibility question for resolution by the jury.'" (*Ibid*.) If the jury found Hogan's claim not to know to be incredible, it was entitled to draw a negative inference—namely, that he did know, and what he knew was incriminating. This is what, under the circumstances of this case, CALCRIM No. 361 allowed.

This reasoning also disposes of Hogan's argument that he was denied due process of law because the instruction allowed an irrational inference not supported by the evidence. The evidence could reasonably support an adverse inference, so the drawing of that inference would not have been irrational. But Hogan further argues that he was

denied due process because the instruction allowed the jury to draw an adverse inference from a failure to explain evidence even if the prosecutor did not ask for an explanation on cross-examination. He says the instruction is unconstitutional because it allows an inference to be drawn from a defendant's mere failure to volunteer an explanation without being asked for one, even though witnesses can only testify in response to questions.

Whatever may be the merits of this argument in the abstract, the problem does not arise in this case. A question during cross-examination was unnecessary because Hogan had already offered his account on direct. The inclusion in this account of a claim that Hogan did not remember having sex with Richards amounted to his claim that the issue of how his sperm got in her rectum was "'outside his knowledge'" (*Belmontes, supra,* 45 Cal.3d at p. 784), and this claim formed an adequate basis for the instruction.

Hogan cites Court of Appeal cases stating the instruction cannot be given if the defendant offers *any* explanation of the evidence, no matter how improbable. (*People v. Kondor* (1988) 200 Cal.App.3d 52, 57; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469.) *Belmontes* is Supreme Court authority to the contrary. Further, Hogan testified he did not know the true explanation for the DNA evidence against him; he said, in effect, he could only hypothesize that Richards was one of the prostitutes he patronized. This is not the same as giving a definite (but implausible) account of the facts.

Hogan also cites *People v. De Larco* (1983) 142 Cal.App.3d 294, 309, in which it was held that the instruction could not be given even though the defendant said he did not remember touching a flashlight on which his fingerprint was found inside a burglarized shop. The defendant said he had visited the shop before the burglary and had touched tools, but did not specifically remember the flashlight. Not remembering leaving a fingerprint on a flashlight during an alleged legitimate visit to a shop, however, is not quite the same as not remembering leaving sperm in a purported prostitute's rectum. The

jury could reasonably find Hogan's account implausible even if it could not do the same in *De Larco.*

## III.  *Cumulative prejudice*

Hogan argues that, regardless of whether the errors identified above are reversible separately, their cumulative prejudicial effect warrants reversal.  We agree.

"[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error."  (*People v. Hill* (1998) 17 Cal.4th 800, 844.)  The "aggregate prejudicial effect of" a series of errors can be "greater than the sum of the prejudice of each error standing alone."  (*Id.* at p. 845.)  Applying the state-law harmless-error standard of *People v. Watson, supra,* 46 Cal.2d 818, we must determine whether it is reasonably probable that Hogan would have obtained a more favorable outcome at trial absent the several errors we have found.

There are some considerations supporting the view that some of the errors were harmless.  One is simply the fundamental unlikeliness of Hogan's story.  If it is true, it means Hogan was exceptionally unlucky:  He had sex with Richards at some point, and then, while his sperm cells were still intact in her body, someone else sexually assaulted and murdered her, but the assault did not leave any DNA evidence.  Yet we do not believe this story is so improbable that the erroneous exclusion of evidence in support of it, the erroneous admission of evidence against it, and an erroneous jury instruction, could not have altered the outcome.

Another point that could be seen as mitigating the impact of the errors involves the issue of alternative explanations for the lack of neutrophils at the bruise site.  It is significant that Hogan's primary theory about the bruise was that he did not inflict it at all:  It was inflicted by an unknown assailant with a foreign object after the time when Hogan had sex with Richards.  If that theory were accepted, it would mean that the absence of neutrophils was irrelevant to the issue of when Hogan had sex with Richards, and the exclusion of evidence on that point would have made no difference.  Still, Hogan

40.

had an alternative theory that, even if the bruise were caused by his penis, this happened during consensual sex at some point prior to the attack. The erroneous evidentiary rulings had a significant impact on this alternative theory, since they effectively confined the time in which Hogan could have had consensual sex with Richards to the night before the morning of the attack, during part of which Richards was observed sleeping. This tended to increase the impression that Hogan's story, if true, would involve an unlikely coincidence.

Avalos, the autopsy doctor, was permitted to testify that there were potential alternative explanations for the lack of neutrophils and he did no investigation of those. This also mitigates the exclusion of defense counsel's further cross-examination of Avalos on this topic and the exclusion of any examination of the defense expert on it. But Avalos's vague testimony—there could have been other causes, but he did not try to find out—likely had a slight effect on the jury compared with testimony about specific conditions like neutropenia and their effects.

Regarding sperm cells, Lewis, the criminalist, testified he had read a study saying they would be unexpected after 24 hours. This implied they would not be unexpected up to 24 hours. It might be said this meant he provided contrary evidence the jury could weigh against his own opinion that six to eight hours was the outer limit and thereby mitigated the prejudice of excluding Pietruszka's testimony on the topic. It did not mitigate it by much, however. Having a prosecution expert say he read some proposition but disagrees with it is not the same as having a defense expert affirm the same proposition. The impact on the jury would be different.

We mention these examples to show we understand that the seriousness of the trial court's errors is debatable if the errors are taken separately. It is when they are taken together that their significance in strengthening the prosecution's case and weakening the defense become clearer. The prosecution evidently perceived the DNA evidence was not enough. It proved Hogan had sex with Richards, but not that he assaulted and killed her.

To fill the gap, the prosecution wove a complex web of circumstantial evidence, including evidence regarding neutrophils, the causation of the bruise, the survival rate of sperm cells, Hogan's character, and Richards's character. The erroneous rulings discussed above worked to hinder the defense or help the prosecution on each of these points. The instructional error allowed the jury to make an improper inference from evidence of Hogan's false statement, evidence that was itself improperly admitted. Taking account of the record as a whole, we cannot say with confidence that the errors were cumulatively harmless under the *Watson* standard. Reversal and remand for a new trial are necessary.

## *DISPOSITION*

The judgment is reversed.

_____
Smith, J.

WE CONCUR:


_____
Hill, P.J.


_____
Franson, J.